The TORRINGTON COMPANY, Plaintiff,

Federal–Mogul Corporation, Plaintiff–Intervenor,

v.

UNITED STATES, Defendant,

SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A., SKF (U.K.) Limited and SKF Sverige AB; RHP Bearings and RHP Bearings Inc.; Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; GMN Georg Muller Nurnberg AG; NSK Ltd. and NSK Corporation; NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH; NMB Thai Ltd., Pelmec Thai Ltd., NMB Singapore Ltd., Pelmec Industries Ltd. and NMB Corporation; FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti S.p.A., FAG (UK) Limited, Barden Corporation (UK) Limited, FAG Bearings Corporation and the Barden Corporation; Peer Bearing Company; Ina Walzlager Schaeffler KG and Ina Bearing Company, Inc., Defendant–Intervenors.

Slip Op. 95–54.
Court No. 92–07–00483.

United States Court of International Trade.

March 31, 1995.

Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, William A. Fennell, John M. Breen, Margaret E.O. Edozien, Robert A. Weaver, Myron A. Brilliant, Geert De Prest, Lane S. Hurewitz and Margaret L.H. Png), Washington, DC, for plaintiff.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Larry Hampel, Joseph A. Perna, V and J. Eric Nissley), Washington, DC, for plaintiff-intervenor.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Marc E. Montalbine); of counsel: Stephen J. Claeys, Stacy J. Ettinger, Thomas H. Fine, Craig R. Giesze, Jeffrey M. Telep, Alicia D. Greenidge and Dean A. Pinkert, Attys., Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Howrey & Simon (Herbert C. Shelley, Alice A. Kipel, Juliana M. Cofrancesco, Thomas J. Trendl and Anne Talbot), Washington, DC, for defendant-intervenors SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A., SKF (U.K.) Ltd. and SKF Sverige AB.

Covington & Burling (Harvey M. Applebaum, David R. Grace and Thomas A. Robertson), Washington, DC, for defendant-intervenors RHP Bearings and RHP Bearings Inc.

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Neil R. Ellis, T. George Davis, Robert A. Calaff and Lee Ann Alexander), Washington, DC, for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.

Hopkins & Sutter (John G. DeGooyer), Washington, DC, for defendant-intervenor GMN Georg Muller Nurnberg AG.

Lipstein, Jaffe and Lawson (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson), Washington, DC, for defendant-intervenors NSK Ltd. and NSK Corp.

Barnes, Richardson & Colburn (Donald J. Unger, Robert E. Burke, Kazumune V. Kano, Peter Sultan and Diane A. MacDonald), Washington, DC, for defendant-intervenors NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp., NTN Corp. and NTN Kugellagerfabrik (Deutschland) GmbH.

White & Case (Walter J. Spak, William J. Clinton, David E. Bond and Edmund W. Sim), Washington, DC, for defendant-intervenors NMB Thai Ltd., Pelmec Thai Ltd.,

NMB Singapore Ltd. and Pelmec Industries Ltd. and NMB Corp.

Grunfeld, Desiderio, Lebowitz & Silverman (Max F. Schutzman, David L. Simon, Andrew B. Schroth, Matthew L. Pascocello and Mark E. Pardo), Washington, DC, for defendant-intervenors FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti SpA, FAG (UK) Ltd., Barden Corp. (UK) Ltd., FAG Bearings Corp. and The Barden Corp.

Venable, Baetjer, Howard & Civiletti (John M. Gurley and Lindsay B. Meyer), Washington, DC, for defendant-intervenor Peer Bearing Co.

Arent Fox Kintner Plotkin & Kahn (Stephen L. Gibson and Eleanor Pelta), Washington, DC, for defendant-intervenors INA Walzlager Schaeffler KG and INA Bearing Co., Inc.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Torrington Company ("Torrington"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final results of its administrative review concerning antifriction bearings (other than tapered roller bearings) ("AFBs") and parts thereof from France, Germany, Italy, Japan Singapore, Sweden, Thailand and the United Kingdom. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews ("Final Results"),* 57 Fed.Reg. 28,360 (June 24, 1992).

Specifically, plaintiff contests Commerce's (1) refusing to find that below-cost transfer pricing constituted either reimbursement of antidumping duties or a basis for investigating reimbursement of antidumping duties; (2) including below-cost sales in calculating profit for purposes of determining constructed value; (3) methodology for comparing U.S. and home market sales; (4) methodology for calculating cash deposit rates for estimated antidumping duties; (5) adjusting foreign market value ("FMV") in exporter's sales price ("ESP") comparisons for inventory carrying costs; (6) methodology for adjusting United States price ("USP") and foreign market value for foreign "value added" consumption taxes ("VAT") that are rebated or not collected by reason of the exportation of the merchandise to the United States; (7) adjusting foreign market value for pre-sale inland freight costs; (8) determining not to deduct resale profit in exporter's sales price transactions; (9) adjusting foreign market value for rebates and billing adjustments; (10) determining not to verify FAG Germany's cost of production ("COP") data; (11) accepting the cost of producing the inputs in its constructed value calculations with respect to FAG–Italy's related party suppliers of certain inputs; (12) calculation of NTN's adjustment for inventory carrying costs; (13) deciding to exclude Koyo's "Roller Chain" sales from its antidumping analysis; (14) accepting the use of quantity rather than weight for NMB Singapore and NMB Thailand as a measure of home market viability; (15) determining that antifriction bearings imported into foreign trade zones ("FTZs") but not entered into the customs territory of the United States were not subject to antidumping duties; (16) treatment of NMB Thailand's Route B sales as home market sales; (17) treatment of NMB's bonded warehouse-to-bonded warehouse sales as home market sales; and (18) adjusting USP for the amount of uncollected or rebated duties and taxes payable by NMB Thailand.

## Background

On May 15, 1989, Commerce published antidumping duty orders on ball bearings, cylindrical roller bearings and spherical plain bearings and parts thereof. *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany,* 54 Fed.Reg. 20,900 (May 15, 1989). On June 28, 1991, July 19, 1991 and August 14, 1991, Commerce initiated administrative reviews with respect to various manufacturers and exporters from France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom for the period May 1, 1990 through April 30, 1991. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts*

*Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews,* 56 Fed.Reg. 29,618 (June 28, 1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 33,251 (July 19, 1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed. Reg. 40,305 (August 14, 1991).

On March 31, 1992, Commerce published the preliminary results of its second administrative reviews. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France: Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews,* 57 Fed.Reg. 10,859 (March 31, 1992).

On June 24, 1992, Commerce published one joint final determination for the nine administrative reviews. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 28,360 (June 24, 1992).

On July 21, 1992, Torrington filed its summons in this case, challenging the final results with respect to France, Germany, Italy, Japan, Singapore, Sweden, Thailand and the United Kingdom.

*Discussion*

■ This Court must uphold final results of an ITA administrative review unless the ITA determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is defined as "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."

*Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

1. *Reimbursement of Antidumping Duties*

■ Torrington contends that whenever a foreign manufacturer sells merchandise to a related U.S. importer at prices below cost plus profit or, alternatively, below cost, the transaction should be regarded as a transfer of funds to the extent that prices are less than the benchmark. Accordingly, Torrington asserts these transfers should be regarded as duty reimbursements to the extent that dumping margins are found and these amounts should be deducted from United States price pursuant to 19 C.F.R. § 353.26 (1992). Citing the legislative history, Torrington argues that this regulation applies in this case as it is an ESP situation. In the alternative, Torrington requests a remand for Commerce to further investigate whether antidumping duties were in fact reimbursed when prices were below these benchmark levels. Torrington contends it does not have the burden to show antidumping duties were being reimbursed. *Memorandum in Support of The Torrington Company's Motion for Judgment Upon the Administrative Record ("Torrington's Brief")* at 32–43.

Asserting it properly refused to find that below-cost transfer pricing constituted either reimbursement of antidumping duties or a basis for investigating reimbursement of antidumping duties, Commerce states nothing in the statute or Commerce's regulations prohibit the transfer of funds between related corporations. Commerce states 19 C.F.R. § 353.26 mandates a deduction to USP, not when there is any transfer between related parties, but rather, when there is reimbursement of antidumping duties. Commerce asserts that it has consistently held that absent evidence of reimbursement, it has no authority to make such an adjustment to U.S. price. *Brass Sheet and Strip From Sweden; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 2706, 2708 (Jan. 23, 1992); *Brass Sheet and Strip From the Republic of Korea; Final Results of Antidumping Duty Administrative Review,* 54 Fed.Reg. 33,257, 33,258 (Aug. 14, 1989).

Therefore, Commerce argues that as Torrington has failed to present any evidence of reimbursement or a link between the transfer of funds and reimbursement, Commerce's action was proper. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Brief")* at 8–11.

NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH (collectively, "NTN") agrees with Commerce that sales at less than the cost of production plus profit are not per se reimbursements of antidumping duties. NTN points out there was no linkage between antidumping duties and any such sales and the statute does not prohibit related parties from transferring money to one another. NTN argues that Commerce acted within its discretion in not further investigating the transfers and that Torrington failed to provide any evidence to demonstrate its argument with respect to NTN. NTN additionally argues that the regulation in question is invalid on its face, does not apply to ESP situations and, therefore, should not be enforced. *Defendant–Intervenor NTN's Response to Plaintiff's Motion for Judgment Upon the Administrative Record ("NTN's Brief")* at 7–21.

FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti S.p.A., FAG (UK) Limited, Barden Corporation (UK) Limited, FAG Bearings Corporation and The Barden Corporation (collectively, "FAG") agrees with Commerce and states that Torrington's assertions are without merit because the reimbursement regulation does not apply to ESP transactions, transactions between related parties or duty deposits, but applies only to the payment of actual duties. Therefore, FAG argues, Commerce properly declined to pursue further investigation of possible reimbursement. *Memorandum of Defendant–Intervenors FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti S.p.A., FAG (U.K.) Limited, The Barden Corporation (U.K.) Limited, FAG Bearings Corporation and The Barden Corporation in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("FAG's Brief")* at 11–24.

NMB Singapore Ltd., Pelmec Industries Ltd., NMB Thai Ltd. and Pelmec Thai Ltd. (collectively, "NMB") agrees with Commerce's position with regard to this issue. *Reply of Defendant–Intervenors NMB/Pelmec to Plaintiff's Motion for Judgment Upon the Administrative Record ("NMB's Brief")* at 18–19.

NSK Ltd. and NSK Corporation ("NSK") also agrees with Commerce on this issue and states that NSK specifically denied on the record that any reimbursement of antidumping duties occurred. NSK also asserts that antidumping duty cash deposits are not import duties under the antidumping law and, as such, they cannot be deducted from USP pursuant to the regulation. *Memorandum of Points and Authorities in Opposition to Motion for Judgment on the Agency Record ("NSK's Brief")* at 40–48.

GMN Georg. Muller Nurnberg AG ("GMN") argues that the reimbursement regulation does not apply to transactions between related parties, and Commerce therefore properly declined to apply that regulation in ESP situations. *Memorandum of Defendant–Intervenor GMN Georg Muller Nurnberg AG in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("GMN's Brief")* at 12–23.

Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo") argues that Commerce correctly concluded that its reimbursement regulation did not apply to the transactions in this review between foreign manufacturers and their U.S. affiliates. Koyo states the mere occurrence of transfer prices between related parties at levels below COP does not prove that one party is reimbursing the other for antidumping duties. Koyo further argues that application of the reimbursement regulation to a transaction between related parties would be contrary to the framework of the antidumping law, which generally considers related parties to comprise a single entity. *Memorandum of Defendant–Intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. in Response to Motion of The Torrington Company for*

*Judgment on the Agency Record ("Koyo's Brief") at 12–18.*

INA Walzlager Schaeffler KG and INA Bearing Company, Inc. ("INA") argues that plaintiff seeks to read a transfer pricing test into the antidumping duty law that is not there. While Torrington would have Commerce determine whether or not export transfer prices between related parties are at less than cost of production or cost of production plus profit, no such test is contained in the antidumping statute or regulations. INA argues that in the absence of any statutory authority to impose transfer pricing rules on related party imports, and in the absence of any statutory definition of such transfer pricing, Commerce properly rejected plaintiff's argument that Commerce introduce a transfer pricing test into its reimbursement regulation. *Reply of Defendant–Intervenors INA Walzlager Schaeffler KG and INA Bearing Company, Inc. to the Motion of Plaintiff The Torrington Company for Judgment Upon the Administrative Record ("INA's Brief") at 4–5.*

SKF USA Inc., SKF France, S.A., SKF GmbH, SKF Industrie S.p.A., SKF Sverige AB and SKF (U.K.) Ltd. (collectively, "SKF") claims that in light of the relevant statutory and regulatory definitions, Commerce correctly concluded, as a matter of law, that foreign producers/exporters could not "reimburse" their related U.S. importers. Further, SKF asserts Commerce correctly found that no evidence existed as to antidumping duty reimbursements having occurred. *Brief of SKF in Opposition to The Torrington Company's Motion for Judgment Upon the Administrative Record ("SKF's Brief") at 18–34.*

RHP Bearings and RHP Bearings Inc. ("RHP") also holds that Commerce acted properly with regard to this issue because Torrington did not provide a factual basis for its claim and antidumping duty deposits are not deductible from USP. *Opposition of Defendant–Intervenors RHP Bearings and RHP Bearings Inc. to Plaintiff's Motion for Judgment on the Agency Record ("RHP's Brief") at 4–7.*

The reimbursement regulation 19 C.F.R. § 353.26, which governs this issue reads in part as follows:

(a) *In general.* (1) In calculating the United States price, the Secretary will deduct the amount of any antidumping duty which the producer or reseller:

(i) Paid directly on behalf of the importer; or

(ii) Reimbursed to the importer.

. . . .

(b) *Certificate.* The importer shall file prior to liquidation a certificate in the following form with the appropriate District Director of Customs.

■ Thus, in order for this regulation to apply, it must be shown that the foreign manufacturer either paid the antidumping duty on behalf of the U.S. importer or reimbursed the U.S. importer for its payment of the antidumping duty. *Id.* The regulation does not impose upon Commerce an obligation to investigate based on mere allegations.

In answering Torrington's argument, Commerce stated:

Evidence of below-cost transfer pricing between related parties is not in itself evidence of reimbursement of antidumping duties. Torrington has failed to establish a link between alleged below-cost transfer pricing and the payment of antidumping duties.... [T]he antidumping law does not require related parties to set up their internal transactions at arm's length, nor does it prohibit them from transferring money from one another.

... [T]he antidumping statute and regulations make no distinction in the calculation of USP between costs incurred by a foreign parent company and those incurred by its U.S. subsidiary. Therefore, the Department does not make adjustments to U.S. price based upon intracompany transfers of any kind. Indeed, the Department has a long-standing practice of denying adjustments for intracorporate payments on the grounds that, because affiliated companies are a single entity for the purposes of the antidumping law, payments from a parent company to its subsidiary

are not expenses to the consolidated corporation as a whole.

*Final Results,* 57 Fed.Reg. at 28,371.

In light of Torrington's failure to produce any evidence showing a link between intracorporate transfers and the reimbursement of antidumping duties, this Court finds Commerce properly decided not to make a deduction to USP for antidumping duty reimbursement or to conduct an investigation concerning transfer prices. Commerce has consistently held that absent evidence of reimbursement, it has no authority to make such an adjustment to USP. *Brass Sheet and Strip From Sweden; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 2706, 2708; *Brass Sheet and Strip From the Republic of Korea; Final Results of Antidumping Duty Administrative Review,* 54 Fed.Reg. 33,257, 33,258. Before Commerce is required to commit resources to investigate the transfers between related corporations, the party who requests the investigation must produce some link between the transfer of funds and reimbursement of antidumping duties.

■ In addition, Commerce does not need to conduct further investigation of alleged reimbursement of antidumping duties because 19 C.F.R. § 353.26(b) specifically requires that an importer file prior to liquidation a certificate with Customs attesting that the importer has or has not "entered into any agreement or understanding for the payment or for the refunding ... of all or any part of the antidumping duties." Failure to file this certificate may be considered by Commerce as proof that the producer or reseller paid or reimbursed the antidumping duties. 19 C.F.R. § 353.26(c). Therefore, once an importer, as those here have done, has indicated on this certificate that it has not been reimbursed for antidumping duties, it is unnecessary for Commerce to conduct an additional inquiry absent a sufficient allegation of customs fraud. This Torrington has failed to do. Therefore, the Court sustains Commerce on this issue.

### 2. *Below–Cost Sales In Calculating Profit For Constructed Value*

■ Torrington argues that Commerce erred in not excluding, as outside the ordinary course of trade, home market sales made below the cost of production when calculating profit factors for use in constructed value. Basically, Torrington contends that below-cost sales are per se outside the ordinary course of trade. Torrington further argues that including below-cost sales in constructed value profit calculations distorts the statutory scheme. *Torrington's Brief* at 43–51.

Commerce asserts it properly included below-cost sales in calculating profit for purposes of determining constructed value, because it is not contrary to the statute and Torrington did not show that these sales were outside the ordinary course of trade. *Defendant's Brief* at 12–18.

The defendant-intervenors agree with the position taken by Commerce. *See, e.g., NTN's Brief* at 21–29.

■Constructed value includes profit for sales of merchandise of the same general class or kind in the home market, in the usual commercial quantities and in the ordinary course of trade, but the profit cannot be less than eight percent of the sum of general expenses and cost. 19 U.S.C. § 1677b(e)(1) (1988). In calculating this profit amount, Commerce considers, essentially, an average profit for all of respondent's home market sales, which sales may include some made at below COP. The statute does not require the exclusion of below-cost sales when determining the profit amount, even though it specifically delineates the above requirements.

Commerce calculates foreign market value by following the general method prescribed by 19 U.S.C. § 1677b(a)(1) (1988). It provides in pertinent part:

The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person ...

(A) at which such or similar merchandise is sold, or, in the absence of sales, offered for sale in the principal markets

of the country from which exported, in the usual commercial quantities and in the *ordinary course of trade* for home consumption....

(Emphasis added); *see also* 19 C.F.R. § 353.46(b) (1992). The statute defines "ordinary course of trade" as "the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15) (1988). Thus, despite Torrington's argument to the contrary, sales in the ordinary course of trade are not limited to sales above cost.

In addition, 19 U.S.C. § 1677b(b) (1988) requires Commerce in its determination of foreign market value to disregard sales made at less than the cost of production if the sales have been made over an extended period of time, in substantial quantities and are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade. Torrington argues by analogy to this provision, but it is not relevant to a constructed value situation. In fact, this provision sets the requirements as to when Commerce should resort to constructed value.

Thus, nowhere does the statute require the exclusion of below cost sales when determining the profit amount in calculating constructed value. In order for sales below-cost to be excluded, it must be shown that the sales were made outside the ordinary course of trade. *See, generally,* 19 U.S.C. § 1677b.

■ Commerce's decision of whether an importer's sales are in the ordinary course of trade is entitled to deference from this Court and plaintiff has the burden of demonstrating the sales Commerce included in its foreign market value calculation were outside the ordinary course of trade. *Nachi–Fujikoshi Corp. and Nachi Am., Inc. v. United States,* 16 CIT 606, 608–09, 798 F.Supp. 716, 718–19 (1992) *and cases cited therein.* This Court has affirmed Commerce's decision to include certain sales in its calculations of dumping margins when a plaintiff has failed to meet its burden of proof.

In this case, Torrington has not met this burden and the administrative record in this case is lacking in substantial evidence to prove otherwise.

The statutory language and structure support Commerce's determination that below-cost sales are not automatically excluded from the calculation of profit in determining constructed value. Torrington failed to produce any evidence or to demonstrate that the below-cost sales involved herein were made outside of the ordinary course of trade. Therefore, Commerce's decision to include these sales in calculating profit for purposes of constructed value is reasonable and in accordance with law and is sustained.

3. *Methodologies For Selecting Similar Merchandise*

■ Torrington contests the use of the family model match methodology. Torrington alleges that Commerce's definition of "similar merchandise" was impermissibly narrow and limiting and resulted in Commerce inappropriately resorting to constructed value when sales comparisons could have been made. Torrington asserts this was inappropriate because the antidumping statute prefers sales comparisons to constructed value comparisons. *Torrington's Brief* at 51–64.

Commerce takes the position that the family approach used in the current reviews is an appropriate method of determining such or similar merchandise. Commerce explains it consulted with the interested parties in this case for their views of the most important distinguishing physical characteristics of AFBs and it thus developed a family matching methodology based upon certain physical characteristics for determining when U.S. and home market AFBs are similar for price comparison purposes. *Defendant's Brief* at 18–27. In explaining its position on this issue, Commerce has stated:

The statute provides the Department with the discretion to determine whether an appropriate home market FMV exists for purposes of comparison to U.S. price (USP) and, if not, when to resort to constructed value as an alternate source of comparison. The Department has the au-

thority to determine what merchandise qualifies as such or similar for the purposes of the statute. [Citation omitted.] Moreover, it is the administering agency rather than an interested party that should make the determination as to what methodology should be used. [Citation omitted.] If the Department determines that such or similar merchandise sold or offered for sale in the home market does not exist for purposes of comparison with a particular USP, the Department may use the constructed value of the merchandise in question as the foreign market value. Section 773(a)(2)....

In the context of the current AFB reviews, the family model match approach constitutes an appropriate use of this discretion. We initially note that bearings do not have to be identical to be members of the same bearing family. The preliminary results demonstrate that bearings within the same family may have significant differences in variable cost of manufacturing.

*Final Results*, 57 Fed.Reg. at 28,365–66.

The defendant-intervenors agree with Commerce's position and state that the statute vests Commerce with the authority to determine whether the home market merchandise and subject merchandise may reasonably be compared. They maintain that Commerce's model match methodology for the current AFB reviews is a reasonable exercise of its discretion because it considers the commercial realities of the AFB market, in particular the extensive variety of models in the market and the fact that families of similar bearings do exist. *See, e.g., Koyo's Brief* at 28–35.

When identical merchandise is not available in the home market for comparison with the merchandise sold to the United States, Commerce must select "similar" comparison merchandise based upon the physical characteristics of the merchandise being compared. 19 U.S.C. § 1677(16) (1988).[1] Commerce has been granted broad discretion to devise a methodology for determining what constitutes "similar" merchandise. *See Smith–Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

An accurate investigation requires that the merchandise used in the comparison be as similar as possible. Furthermore, there is a statutory preference for comparison of most similar, if not identical merchandise for the purpose of FMV calculations. 19 U.S.C. § 1677(16); *see Timken Co. v. United States*, 10 CIT 86, 96, 630 F.Supp. 1327, 1336 (1986). Undoubtedly, Commerce's fundamental objective in an antidumping investigation is to compare the United States price of imported merchandise with the value of "such or similar merchandise" sold in the foreign market. *Timken*, 10 CIT at 95, 630 F.Supp. at 1336.

Thus, contrary to the assertion of Torrington, the statute does not require Commerce to use a methodology that identifies the greatest number of matches of similar merchandise.

In this administrative review, Commerce determined what constituted "similar merchandise" for purposes of comparing U.S. and foreign market sales by grouping bearings into families based upon eight defined physical characteristics. Commerce also em-

---

1. 19 U.S.C. § 1677(16) (1988) provides:

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purpose of part II of this subtitle can be satisfactorily made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

ployed a 20% difmer cap so that bearings having a greater than 20% difference in their variable costs of manufacture would not be treated as "similar." *Final Results,* 57 Fed. Reg. at 28,364–67.

The issue herein is not whether Commerce's model match methodology gives a broad or narrow construction to the term "similar" merchandise. The issue is whether that methodology is supported by substantial evidence and is otherwise in accordance with law. This Court finds that Commerce's model matching methodology was within the broad discretion it is granted to determine "similar merchandise". Torrington has not provided any evidence of unreasonable behavior on the part of Commerce. Commerce's action on this issue was in accordance with law and supported by substantial evidence and is hereby affirmed.

4. *Cash Deposit Rates For Estimated Antidumping Duties*

▆ Commerce calculated the cash deposit rate for each exporter by first determining the amount of potential uncollected dumping duties ("PUDD"), the aggregate amount by which FMV exceeded USP for each exporter. It then divided each exporter's PUDD by the total net U.S. price for that exporter's sales under each dumping order during the period of review. In order to derive a single deposit rate for each class or kind of merchandise for each exporter included in the review, Commerce weight-averaged the deposit rates. In contrast, to calculate the assessment rate for ESP sales, Commerce divided the total PUDD for the reviewed sales by the total entered value of those sales. *Defendant's Brief* at 28.

Torrington objects to Commerce's use of different methodologies for the assessment of antidumping duties and for the establishment of future cash deposit rates. Torrington asserts that Commerce's distinction between the methodologies used to calculate the assessment rate and the cash deposit rate will systematically result in undercollection of duties. Torrington further asserts that the decision of Commerce to apply different margin methodologies is arbitrary and unreasonable as the most reasonable basis for assessment of future duties is past pricing practices. *Torrington's Brief* at 64–69.

GMN asserts that Torrington failed to raise this issue at the administrative level, and so waived its right to address it before this Court. GMN further states that substantively, Torrington's arguments are without merit. *GMN's Brief* at 40. All the other parties agree with Commerce's methodology as well.

Commerce states that neither the statute nor the regulations specify the manner in which Commerce must establish deposits of estimated duties and that its calculation was a reasonable exercise of its discretion. *Defendant's Brief* at 30. Commerce fully explained its use of the two different methodologies in the administrative review:

> Under any method of calculating cash deposit rates, there would be no certainty that the cash deposit would equal the amount by which foreign market value exceeds U.S. price. As the Department has stated on numerous occasions, duty deposits are merely estimates of future dumping liability. Should the amount of the deposits of estimated antidumping duties be less than the amount assessed, the Department will instruct the U.S. Customs Service to collect the difference with interest, as provided for under sections 737 and 778 of the Tariff Act and 19 CFR 353.24.

> Furthermore, in many instances, we do not know the entered value related to purchase price sales and therefore cannot calculate a deposit rate in the same manner as we calculated ESP assessment rates. To allow for this circumstance, the Department would have to use importer-specific deposit rates and different basis for deposit rates for each importer. However, as we stated in the final results of the first review of AFBs, we believe that the need for a precise estimate is outweighed by the need to provide the U.S. Customs Service with a set of deposit rates which can be effectively administered.

> In addition, we must maintain a consistent standard for determining whether weighted-average dumping margins are de minimis. . . .

Finally, we must maintain the same basis for determining whether weighted-average dumping margins are de minimis and whether cash deposits are required. Otherwise, interested parties may face conflicting interests in requesting reviews.

*Final Results,* 57 Fed.Reg. at 28,377.

The Court has fully addressed this issue previously in *Federal–Mogul Corp. v. United States,* 17 CIT ——, 813 F.Supp. 856 (1993), and *Torrington v. United States,* 17 CIT ——, 818 F.Supp. 1563 (1993), and adheres to its decisions on this issue. Therefore, this Court finds that the methodology used by the ITA in this review is reasonable and in accordance with law. *See also Zenith Elecs. Corp. v. United States,* 15 CIT 394, 770 F.Supp. 648, 655 (1991); *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 712 F.Supp. 931, 957 (1989).

### 5. *Foreign Market Value Adjustment for Inventory Carrying Costs*

 Torrington argues that Commerce's adjustment to FMV for inventory carrying costs is contrary to the statute, legislative history, the relevant regulation and long-standing agency practice. Torrington asserts that, although Commerce should make an adjustment for inventory carrying costs to ESP, inventory carrying costs are indirect selling expenses and should not have been deducted from FMV. *Torrington's Brief* at 69–75.

Commerce asserts it has been its long-standing practice to treat inventory carrying costs as indirect selling expenses and to deduct them from FMV pursuant to the ESP offset, 19 C.F.R. § 353.56(b)(2) (1992). *Defendant's Brief* at 31–35. In the final results, Commerce explained:

> The Department has determined previously, and continues to maintain, that inventory carrying costs are properly classified as indirect selling expenses since they do not relate to particular sales. [Citation omitted.] The nature of this expense, and therefore its classification, holds true regardless of the market in which it was incurred. Second, as we stated in the original investigation and first administrative review of this proceeding, in order for

comparisons to be fair, it is necessary to make inventory carrying cost adjustments to both FMV and USP.... Because the seller incurs the opportunity cost of holding inventory in both markets, and because we adjust for that cost in the U.S. market, we must also adjust for the same cost in the home market.

*Final Results,* 57 Fed.Reg. at 28,410.

Defendant-intervenors agree with Commerce's methodology with regard to this issue.

Commerce is required to adjust the exporter's sales price by reducing it by the amount, if any, of expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise. 19 U.S.C. § 1677a(e)(2) (1988).

In *Torrington Co. v. United States,* 17 CIT ——, 824 F.Supp. 1095 (1993), *dismissed,* 17 CIT ——, 834 F.Supp. 1405 (1993), *aff'd,* 44 F.3d 1572 (Fed.Cir.1995), this Court found that Commerce's adjustment to FMV for imputed inventory carrying costs pursuant to 19 C.F.R. § 353.56(b)(2) was a reasonable exercise of Commerce's discretion in implementing the antidumping duty statute. In *Torrington Co.,* 17 CIT ——, 818 F.Supp. 1563, this Court addressed the challenges that Torrington is making to Commerce's methodology of adjusting FMV for inventory carrying costs in this review. This Court adheres to those decisions on this issue and finds that Commerce's deduction from FMV of home market presale inventory carrying costs was reasonable and in accordance with law.

### 6. *Circumstance of Sale Adjustment for Value Added Tax*

 Torrington asserts Commerce ought to have made an upward adjustment to USP for VAT not collected on exports to the United States, to make USP comparable to home-market prices that already include fully-assessed VAT. Torrington challenges Commerce's VAT methodology and requests that this Court remand this issue to Commerce with instruction to follow this Court's decisions in *Federal–Mogul Corp.,* 17 CIT ——,

813 F.Supp. 856, and *Torrington Co.*, 17 CIT
——, 818 F.Supp. .1563. *Torrington's Brief*
at 75–77.

Commerce agrees that this case should be
remanded in light of the Federal Circuit's
decision in *Zenith Elecs. Corp. v. United
States*, 988 F.2d 1573 (Fed.Cir.1993), *reh'g,
en banc, denied* (Fed.Cir. Apr. 29, 1993), that
Commerce may not make a circumstance of
sale ("COS") adjustment in connection with
VAT. *Defendant's Brief* at 35–36.

In *Zenith*, the Federal Circuit held that
Commerce may not make a COS adjustment
to FMV to account for home market VAT.
*Zenith*, 988 F.2d at 1580–82. The Court
noted that adjusting USP alone distorted the
dumping margin, as a result of a "multiplier
effect" inherent in the way taxes are as-
sessed. *Id.* at 1578. The Court, however,
concluded that this distortion is inevitable
and was clearly contemplated by Congress.
*Id.* at 1580–82. The Court held the export-
ers responsible for the multiplier effect and
did not require any accounting or compensat-
ing for the effect. *Id.* In what is clearly
dicta, the Court did, however, contemplate
that Commerce could eliminate the multiplier
effect by adjusting USP by amount, rather
than by rate, of *ad valorem* tax. *Id.* at 1582.
The dicta appear in footnote 4:

> [19 U.S.C. § 1677a(d)(1)(C) ] by its express
> terms allows adjustment of USP in the
> *amount* of taxes on the merchandise sold
> in the country of exportation. While per-
> haps cumbersome, Commerce may elimi-
> nate the multiplier effect by adjusting USP
> by the amount, instead of the rate, of the
> *ad valorem* tax.

*Id.*

On the basis of that language, all the de-
fendant-intervenors suggest this Court re-
quire Commerce adjust USP in this case by
the amount, and not the rate, of the forgiven
VAT. *See, e.g., NSK's Brief* at 24–30. Tor-
rington disagrees, arguing Commerce must
not adhere to the methodology suggested in
the *Zenith* footnote as it is contrary to the
substantive holding of the case. *Reply of the
Torrington Company, Plaintiff, to Responses
of Defendant and Defendant–Intervenors to
Plaintiff's Motion for Judgment on the*
*Agency Record Pursuant to Rule 56.2 ("Tor-
rington's Reply")* at 45–54.

This Court has already decided this issue
and has found that footnote 4 is clearly at
odds with the body of *Zenith* and the lan-
guage of the statute. *Federal–Mogul Corp.
v. United States*, 17 CIT ——, ——, 834
F.Supp. 1391, 1396–97 (1993). This Court
declines to depart from its previous interpre-
tation of *Zenith*, which is to require Com-
merce adjust USP by the rate of VAT forgiv-
en in the foreign market, and *not* by the
amount of forgiven VAT. *Id.*

Therefore, this issue is remanded so that
Commerce may apply the rate of VAT forgiv-
en to USP, calculated at the same point in
the stream of commerce where the VAT is
applied for home market sales, and add the
resulting amount to USP, without a COS
adjustment to FMV.

### 7. *FMV Adjustment For Pre–Sale, Inland Freight*

■■■ Torrington argues that Commerce
should not have made an adjustment to for-
eign market value for pre-sale inland freight
expenses when the expenses are not linked to
particular sales. Torrington argues that
Commerce's decision to deduct all pre-sale
movement expenses from FMV is contrary to
past agency practice and to previous deci-
sions of this Court. Torrington further as-
serts that 19 U.S.C. § 1677a(d)(2)(A) (1988)
requires Commerce to adjust USP for all
pre-sale inland freight, but there is no corre-
sponding provision authorizing this adjust-
ment to FMV. *Torrington's Brief* at 78–81.

Commerce rejected Torrington's argument
in the final results. *Final Results*, 57 Fed.
Reg. at 28,397.

Commerce explains that, given the inequi-
ties presented by its earlier approach to the
treatment of pre-sale movement expenses in-
curred in the home market, Commerce's de-
cision to depart from the earlier approach
was reasonable. By deducting from FMV
pre-sale movement expenses incurred upon
home market sales, Commerce asserts that it
properly compares the ex-factory prices for
United States sales with ex-factory prices in
the home market. *Defendant's Brief* at 36–

40. Defendant-intervenors agree with Commerce's position.

▇▇▇ It is well-established that when Congress has included specific language in one section of a statute but has omitted it from another related section of the same act, it is generally presumed that Congress intended the omission. *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). In the case at issue, therefore, Congress evidently intended the omission of a provision requiring an adjustment for inland freight expenses incurred in the home market.

The Court of Appeals for the Federal Circuit, in *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398, 401–02 (Fed.Cir.1994), *reh'g, en banc, denied* (Fed.Cir. March 1, 1994), *and cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994), stated:

> [W]e believe that had Congress intended to deduct home-market transportation costs from FMV, it would have made that intent clear. FMV and USP are intimately related concepts, given full meaning only by their relationship to one another. The Antidumping Act revolves around the difference between the two. *See* 19 C.F.R. § 353.2(f)(1) (1993) (defining dumping margin with reference to USP and FMV). In slightly different forms, the USP provision, 19 U.S.C. § 1677a, and the FMV provision, 19 U.S.C. § 1677b, were passed together as part of the original Antidumping Act, 1921, ch. 14, 42 Stat. 11 (1921). From the Act's beginning, therefore, it is likely Congress has considered one only with reference to the other and has been well aware of any differences between them. That Congress included a deduction for transportation costs from USP but not from FMV leads us to conclude that Congress did not intend pre-sale home-market transportation costs to be deducted from FMV.

The *Ad Hoc Comm.* court, however, limited its decision to the calculation of FMV in purchase price situations only. *Id.* at 400. As it is not clear to this Court whether FMV was calculated in this case using purchase price or ESP, this Court remands this issue to Commerce to deny the adjustment to

FMV for pre-sale home market transportation expenses only where FMV was calculated using purchase price.

## 8. *Deduction of Resale Profit in ESP Transactions*

▇▇▇ Torrington alleges Commerce improperly failed to deduct related-importer resale profits in calculating ESP, asserting that Congress intended such a deduction be made. Torrington argues that this failure undermines the concept of ESP and deprives U.S. industry of the remedy afforded by law. According to Torrington, allowing the reseller (the importer) to retain its profit artificially inflates USP and reduces dumping margins. Torrington respectfully disputes this Court's previous decisions on this issue, which have upheld Commerce's failure to deduct importer resale profits. *Torrington's Brief* at 81–87.

▇▇▇ Anticipating defendant's objection to this argument, Torrington claims this issue is properly before the Court even though Torrington did not raise it at the administrative level, as it is not necessary to raise futile issues at the administrative level solely to preserve them for judicial review. Torrington asserts the futility doctrine applies here because Commerce has clearly expressed its position on this issue in numerous past proceedings and to have raised the issue before Commerce would have served no good purpose. Finally, Torrington states there is no prejudice to Commerce by Torrington raising this issue before the Court. *Torrington's Brief* at 81–87.

Because Torrington did not raise this issue before Commerce, defendant argues this issue is not properly before this Court for review pursuant to the doctrine of the exhaustion of administrative remedies. In the alternative, defendant points out the previous occasions on which this Court has rejected Torrington's argument on this issue and urges this Court to do so again. *Defendant's Brief* at 41–49.

Defendant-intervenors argue that Torrington's arguments regarding this issue should not be considered by this Court because the issue was not properly raised by Torrington

before Commerce and because it is prejudicial to them to argue the issue for the first time before this Court. In the alternative, defendant-intervenors urge this Court to reject Torrington's argument on its merits.

Although Torrington did not exhaust its administrative remedies, this Court agrees with Torrington that it would have been futile to do so and deems this issue is properly before the Court.

However, having already ruled on this issue on numerous occasions, this Court rejects Torrington's arguments. This Court has consistently held that Commerce is not required to deduct the profits of an importer from its calculation of ESP. *See, e.g., Timken Co. v. United States,* 16 CIT 429, 437, 795 F.Supp. 438, 445 (1992); *see also Timken Co. v. United States,* 10 CIT 86, 102–11, 630 F.Supp. 1327, 1341–48 (1986). Torrington has provided no new arguments in addition to those which have already been considered and rejected by this Court. This Court therefore adheres to those decisions and hereby affirms Commerce's action regarding this issue.

### 9. *Adjustment to FMV for Rebates and Billing Adjustments*

 In the final results, Commerce determined that home market rebates and post-sale price adjustments ("PSPAs") that were not allocated upon a product-specific basis, but were allocated upon a customer-specific basis, should be treated as indirect selling expenses. *Final Results,* 57 Fed. Reg. at 28,400.

Torrington argues that such adjustments should be rejected if the underlying allocation method included rebates or PSPAs that were incurred upon merchandise that was not within the scope of the antidumping duty orders on antifriction bearings. Torrington asserts that Commerce is correct in its understanding of the law that properly identified and attributed home-market billing adjustments may be treated as direct expenses. But Torrington asserts Commerce was incorrect as a matter of law in treating as indirect expenses home-market billing adjustments that could not be linked to specific sale transactions. Torrington requests a remand of

this issue with instructions to eliminate price adjustments related to out-of-scope merchandise or, if not possible, to deny the claims in their entirety. *Torrington's Brief* at 87–89.

Commerce requests this Court remand this case so that it can determine whether the adjustments at issue may be allocated without including those paid upon out-of-scope merchandise or, if Commerce cannot make such an allocation upon the basis of the existing record, to deny the adjustment. *Defendant's Brief* at 49–50.

NTN argues that, as Commerce has accepted reporting of credit expense on a customer-specific basis, it is reasonable for Commerce to determine that customer specificity was also sufficient for purposes of post-sale rebates and discounts. However, NTN argues alternatively, in light of this Court's decision in *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1577–79, this case should be remanded to Commerce to allow it to develop a methodology which removes PSPAs and rebates paid on sales of out-of-scope merchandise from any adjustments made to FMV for PSPAs or rebates. *NTN's Brief* at 51–53.

FAG argues that Torrington failed to raise this issue in the general issues portion of the underlying administrative proceeding and therefore failed to preserve it for judicial review for any company other than SKF and Koyo. *FAG's Brief* at 61–62.

NSK argues that Torrington has put forward no argument that requires this Court to remand the final results for redetermination as to NSK's lump-sum PSPAs because NSK correctly reported only rebates allocable to in-scope merchandise, and Commerce's treatment of this amount as an indirect selling expense represents one reasonable treatment of this adjustment. NSK requests that this Court affirm Commerce's results regarding rebates and billing adjustments as they apply to NSK. *NSK's Brief* at 48–52. SKF and Koyo also contest Torrington's argument and assert its claim for billing adjustments as indirect expenses should be sustained. *SKF's Brief* at 105–12; *Koyo's Brief* at 48–49. Koyo alternatively argues this issue should be remanded for Commerce to recon-

sider the adjustments in light of *Torrington*. *Koyo's Brief* at 49.

NMB requests that this Court remand this issue to Commerce so that it can uphold its treatment of the rebates and PSPAs consistently with this Court's decision in *Torrington*. *NMB's Brief* at 32–33.

It is clear from the administrative record that PSPAs and rebates on sales of out-of-scope merchandise were used to calculate the adjustment to FMV for PSPAs and rebates. *See Final Results,* 57 Fed.Reg. at 28,400. It is also clear that no effort was made to eliminate PSPAs and rebates paid on out-of-scope merchandise, although Commerce treated as indirect selling expenses rebates and PSPAs that were not allocated on a product-specific basis, but were allocated upon a customer-specific basis. *See id.*

Commerce cannot use merchandise outside the scope of its review to assess antidumping duties. 19 U.S.C. § 1675(a)(2) (1988); *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1578–79.

More specifically, the Federal Circuit has held that an adjustment must be directly correlated with specific in-scope merchandise on the basis of actual costs for the adjustment to be deducted from foreign market value. *Smith–Corona Group v. United States,* 713 F.2d 1568, 1580 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). In *Smith–Corona,* the court approved an apportionment of total rebates paid between in-scope and out-of-scope sales because the apportionment yielded the actual amount per unit paid on sales of in-scope merchandise. *Smith–Corona,* 713 F.2d at 1580. Such an apportionment was possible because the rebates in *Smith–Corona* were granted as a fixed percentage of sales, regardless of the models sold. *Id.*

This Court cannot allow Commerce to use a methodology which allows for the inclusion of PSPAs and rebates on out-of-scope merchandise in calculating adjustments to FMV and, ultimately, the dumping margins. Accordingly, this Court remands this issue to Commerce to allow it to develop a methodology which removes PSPAs and rebates paid on sales of out-of-scope merchandise from

any adjustments made to FMV for PSPAs or rebates or, if no viable method can be developed, to deny such an adjustment in its calculation of FMV.

### 10. *Failure to Conduct Verification of FAG Germany's COP Data*

■ During these administrative proceedings, Commerce decided not to verify the cost of production section of FAG Germany's ("FAG") data submissions. Commerce made this determination based upon a number of factors including the volume and significance of a particular firm's shipments from the country under review, the firm's past verification history, and Commerce's evaluation of the credibility of the data submitted by that firm in the context of the review under consideration. *Final Results,* 57 Fed.Reg. at 28,425.

Torrington asserts that in the first review, Commerce already determined that good cause existed for conducting a verification of FAG's cost accounting system and yet Commerce cancelled that cost verification. In the second review, Torrington alleges Commerce did not verify FAG's cost accounting system and there were therefore two consecutive reviews in which Commerce did not conduct a verification of FAG's cost accounting system despite the fact that Commerce had good cause. Torrington therefore argues that, pursuant to 19 U.S.C. § 1677e(b)(3)(B) (1988), Commerce was required to perform a verification in the second review. Torrington cites to the legislative history for support of its proposition. Torrington requests a remand for verification or, alternatively, for the application of best alternative information. *Torrington's Brief* at 89–94.

Torrington also states that the questions raised by Torrington throughout both reviews with respect to FAG's cost system went to the fundamental ability of the system to deliver accurate results. Without verification, Torrington asserts Commerce could not resolve those questions. *Id.* at 93.

In the final results, Commerce explained:

With respect to administrative reviews, the Department is required to verify information under 19 CFR 353.36(a)(1) if the Secretary decides that good cause for veri-

fication exists, or if a request for verification is received from an interested party no later than 120 days after publication of notice of initiation and the Department has not conducted a verification during either of the two immediately preceding administrative reviews.

With respect to these reviews, the Department's decision as to whether there was good cause for verifying a certain response rested on a variety of factors or circumstances. Among the Department's considerations were the volume and significance of a particular firm's shipments from the country under review, the firm's past verification history, and our evaluation of the credibility of the data submitted by that firm in the context of the review under consideration. Since these are the second administrative reviews for AFBs, there are no firms under review which have not been verified in the two previous reviews. Therefore, the Department did not need to consider this requirement for its verification decisions.

*Final Results,* 57 Fed.Reg. at 28,425.

Defendant argues that Torrington's contention that good cause existed because FAG used a cost accounting system different from that used in the original investigation of anti-friction bearings from Germany is without merit. Commerce asserts FAG did not adopt a new cost accounting system as alleged by Torrington. According to Commerce, the underlying methodology and organization of FAG's cost accounting system did not differ between the system used by FAG for this administrative review and the system that was verified by Commerce during the less-than-fair-value investigation. The only difference between FAG's cost accounting system in this administrative review and in the less-than-fair-value investigation is that, after the investigation, FAG updated the standard costs for over 40,000 products so that those standard costs would have a uniform basis. Commerce points out that its evaluation of FAG's data was not based solely upon information submitted by FAG, but was based also on Commerce's verification of FAG's sales data in the previous review and investigation. In addition, Commerce states

it acted within its broad discretion and was supported by substantial evidence in determining not to conduct verification in this case. *Defendant's Brief* at 50–54.

FAG agrees with the position of Commerce on this issue. FAG asserts it submitted a comprehensive cost response to Commerce detailing fully its cost system and providing substantial documentary support for all its major cost calculations. FAG further states that, after reviewing FAG's complete cost response and plaintiff's comments, Commerce issued an extensive supplemental cost questionnaire to which FAG responded in detail. FAG agrees that Torrington timely requested verification of its cost and sales responses, but asserts its cost system and cost data were fully verified in the original less-than-fair-value investigation and that Commerce conducted a full verification of FAG's home market sales response (including portions of its cost accounting system and cost allocation methodologies). *FAG's Brief* at 62–69.

In sum, FAG argues that Commerce, consistent with its discretion and acting within the parameters set by the Court for determining the existence of "good cause" for verification purposes, correctly and reasonably concluded that a cost verification for FAG Germany was not required. *Id.*

In relevant part, 19 U.S.C. § 1677e(b) (1988) states:

> The administering authority shall verify all information relied upon in making—
>
> . . . . .
>
> (3) a review and determination under section 1675(a) of this title, if—
>
> > (A) verification is timely requested by an interested party ... and
> >
> > (B) no verification was made under this paragraph during the 2 immediately preceding reviews and determinations under that section of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

This provision is mirrored by 19 C.F.R. § 353.36(a) (1992).

It is uncontested that Torrington's request for verification was timely and that, this being the second review, there were not yet two immediately preceding reviews. Thus, whether good cause for verification was shown is solely at issue in this case.

■ The statute and regulations clearly leave to Commerce the determination of whether good cause for verification exists. 19 U.S.C. § 1677e(b); 19 C.F.R. § 353.36(a)(iv). If Commerce is satisfied with a respondent's data and determines that good cause to verify does not exist, and Commerce's determination is supported by substantial evidence on the administrative record, this Court will uphold Commerce's determination. 19 U.S.C. § 1516a(b)(1)(B).

In this case, Commerce closely examined FAG's cost response, requested additional information and decided that good cause for verification did not exist. Germany Public Document No. 259, Frames 1822–62; Germany Public Document No. 355, Frames 1539–48.

Torrington failed to establish that good cause existed for Commerce to verify FAG's cost of production data. Torrington's allegation of omissions and discrepancies by FAG are insufficient to show good cause because Commerce evaluated FAG's submissions and deficiency responses and found them to be credible. In addition, Commerce's evaluation of FAG's data was not based solely upon information submitted by FAG, but was also based upon the fact that Commerce had successfully verified FAG's sales data in the previous review and successfully verified all of FAG's data in the investigation. *Final Results,* 57 Fed.Reg. at 28,425; Germany Public Document No. 355, Frames 1539–1548.

Commerce having reviewed the data that FAG submitted and having verified FAG's sales data in the previous review and verified all of FAG's data in the investigation, this Court finds that in this case, Commerce's determination was supported by substantial evidence on the administrative record and is sustained.

11. *Value of Major Inputs From Related Parties*

■ FAG–Italy purchased certain parts from its parent company, FAG–Germany. Because the purchases of these parts were not at arm's-length, FAG–Italy reported as the cost of the parts FAG–Germany's cost of production plus movement expenses. Commerce used these costs reported by FAG–Italy in its calculation of constructed value ("CV"). *Final Results,* 57 Fed.Reg. at 28,-416; *Defendant's Brief* at 55.

Torrington asserts Commerce erred in calculating the value of major inputs obtained by FAG–Italy from related parties. Torrington argues that under 19 U.S.C. § 1677b(e)(2) and (3) (1988), in related party transactions, Commerce is required to obtain and compare the values of major inputs obtained from related and unrelated parties. Because FAG–Italy provided related-party costs rather than transfer prices and Commerce was therefore unable to determine the actual related-party transfer prices, Torrington argues Commerce was required to value the inputs based on the best information available of what an unrelated party would charge for such inputs. Torrington requests a remand with instructions that Commerce do so, including a reasonable amount for profit. *Torrington's Brief* at 95–98.

FAG argues that as Torrington failed to address this specific issue at the administrative level, it is improperly relying upon the arguments made by Federal–Mogul to raise this issue on appeal. Since Torrington did not specifically brief this issue, FAG argues, citing the doctrine of exhaustion of administrative remedies, it cannot now claim that Commerce acted improperly. Alternatively, FAG asserts Torrington's claim fails on the merits. FAG states there is no independent market for the components involved from which prices could have been derived and the value provided by FAG–Italy was not less than the cost of production, as required by 19 U.S.C. § 1677b(e)(3), because the value was FAG–Germany's cost of production. Consequently, the value did not violate the statute and there were no arm's length prices to compare to transfer prices. FAG points out that there was nothing unlawful in Com-

merce's decision to accept the related company's cost of production for its CV calculations. *FAG's Brief* at 70–74.

Defendant also raises the doctrine of exhaustion of administrative remedies, stating that although Federal–Mogul contested Commerce's use of these costs during the administrative reviews, Torrington did not raise any objection. Commerce asserts Torrington cannot for the first time before this Court argue Commerce should have valued the inputs which FAG–Italy obtained from its related parent using an unrelated party transfer price. Alternatively, Commerce, too, asserts Torrington's claim should be denied on the merits. *Defendant's Brief* at 55–57.

This Court disagrees and holds that, although Torrington failed to avail itself of the opportunity to make its arguments before Commerce, Torrington is not barred from arguing, for the first time before this Court, that Commerce improperly calculated the value of major inputs from related parties.

In the Final Results, Commerce stated, "The record does not provide specific evidence that warrants rejecting using cost of production to value purchases from related parties. The company and its counsel certified that this information was accurate." *Final Results*, 57 Fed.Reg. at 28,416.

First, Torrington's reliance on 19 U.S.C. § 1677b(e)(3) is misplaced. That section applies where Commerce has reasonable grounds to believe or suspect that the value attributed to inputs is less than the costs of producing those inputs. Commerce has accepted cost of production as the best evidence of the value of the inputs from FAG–Italy's related supplier. Torrington has pointed to no evidence which indicates that Commerce should believe or suspect that the amount represented as the value of these inputs is less than the cost of production of the inputs. Second, a modification of FAG–Italy's COP data for the purpose of assuring that the costs of production exceeds an unknown value in a nonexistent market could not be justified.

■ Nevertheless, in calculating constructed value, Commerce is obligated to allocate profit, as well as various costs and expenses to the products under investigation. *See* 19 U.S.C. § 1677b(e)(1) (1988). *See also* 19 C.F.R. § 353.50(a) (1992). Where determining a profit amount is problematical, Commerce is not without guidance. It may employ the statutory minimum of eight percent of the sum of general expenses and cost. 19 U.S.C. § 1677b(e)(1)(B)(ii) (1988).

Hence, as profit is a part of the constructed value calculation, the Court finds that Commerce erred in not adjusting FAG–Italy's COP data to include profit in its calculation of constructed value. In this respect, the constructed value calculation is not supported by substantial evidence on the record and is not in accordance with law. This case is remanded to Commerce with instructions to add to FAG–Italy's COP data an amount for profit which is not less than the statutory eight percent minimum and to make any adjustments to constructed value that may be required as a result. *Federal–Mogul Corp. v. United States*, 18 CIT ——, ——, 862 F.Supp. 384, 404 (1994).

With regard to the COP calculation, the Court agrees with Commerce that no statutory authority requires what plaintiff seeks. *See* 19 C.F.R. § 353.51(c) (1992); *Federal–Mogul Corp.*, 18 CIT at ——, 862 F.Supp. at 404. Hence, with respect to the calculation of FAG–Italy's COP, Commerce is sustained.

12. *Adjustments to FMV for NTN's Inventory Carrying Costs*

■ Torrington challenges Commerce's grant of adjustments to foreign market value for inventory carrying cost with respect to NTN. Torrington alleges that NTN included in its claim amounts for work in process, raw materials, and supplies, thereby inflating an adjustment which, under recent Commerce practice, had been limited to finished goods inventory. *Torrington's Brief* at 98–102.

NTN claims that it used the same method of allocation as it did in the first review and in the investigation. NTN further claims that in both instances Commerce accepted the allocation as reasonable and that the allocation methodology is based on its books

and records, the accuracy of which has been verified in both the investigation stage and in the first review of this case. *NTN's Brief* at 54.

Defendant requests that the case be remanded to Commerce so that it can address the issues raised by Torrington concerning NTN's adjustment for inventory carrying costs. Defendant states that Commerce inadvertently failed to address Torrington's arguments as to this issue during the administrative review. *Defendant's Brief* at 57–58. Torrington agrees with Commerce that this matter should be remanded. *Torrington's Reply* at 80.

This Court agrees and remands the case to Commerce to address the issues raised by Torrington concerning NTN's adjustment for inventory carrying costs and to set forth the basis for its determination.

### 13. *Exclusion of Koyo's "Roller Chain" Sales*

■ Torrington argues that Commerce erred by excluding from the U.S. sales listing all but one of the bearing models alleged to constitute "Roller Chain" sales. *See Roller Chain, Other Than Bicycle, From Japan; Final Results of Administrative Review of Antidumping Finding*, 48 Fed.Reg. 51,801, 51,804 (Nov. 14, 1983). It alleges that Koyo failed to adequately document entitlement to "Roller Chain" exclusion of these sales because Koyo failed to provide Commerce with the entered values and resale prices of the identified merchandise and further processing analysis for one particular imported bearing model. According to Torrington, Koyo failed to satisfy its burden of demonstrating that the value of the imported product was insignificant in comparison to the value of the manufacturing in the United States. Torrington requests this Court remand with instructions that Commerce apply BIA. *Torrington's Brief* at 102–116.

Defendant argues that during the administrative proceedings, Koyo provided Commerce with sufficient data to demonstrate its entitlement to the granted exclusions. *Defendant's Brief* at 58. In the final results, Commerce stated:

The Department determined that Koyo did provide sufficient information to demonstrate the applicability of the "Roller Chain" rule to certain identified merchandise. By letter of December 23, 1991, Koyo reported the entered values and estimated resale prices of the identified "Roller Chain" merchandise. However, the value of one particular imported bearing model exceeds one percent of the finished product sold to unrelated customers. Accordingly, importations of that model are not excluded from the scope of the relevant order by application of the "Roller Chain" principle and, therefore, should not have been excluded from Koyo's U.S. sales listing.

*Final Results,* 57 Fed.Reg. at 28,379. Commerce did apply a BIA rate to sales of a model for which Koyo was unable to provide the necessary further manufacturing information. *Id.*

Koyo submitted a letter describing the products sold to the related companies and providing the information requested by Commerce with regard to the entered value of the scope merchandise and the sales value of the non-scope merchandise sold by the U.S. affiliates to the first unrelated customers. *Final Results,* 57 Fed.Reg. at 28,379. Defendant maintains that this submission provided Commerce with adequate substantiation of the entered values of the imported merchandise and the resale prices of the finished products, particularly in light of the difficulties faced by Koyo in compiling the submission. Defendant asserts that Torrington has not shown any distortions in Koyo's estimates and allocations. *Defendant's Brief* at 58–60.

Koyo does not dispute that its calculations of whether the entered value of the products at issue exceeded the one percent "Roller Chain" threshold were based on estimated data regarding the sales values of the finished merchandise sold by the related U.S. parties to their first unrelated customers. However, such estimates were required because the related U.S. parties refused to provide Koyo with any information regarding the sales values of the products they sold to their unrelated U.S. customers. Koyo as-

serts it cooperated fully with Commerce in providing all information available to it and, as Commerce accepted the information, it would be unlawful to now apply BIA on the basis of Koyo's failure to provide data that was never requested. *Koyo's Brief* at 49–55.

Torrington has given a history of the review and throughout its brief claims that Koyo failed to provide complete and accurate information regarding the entered values of the merchandise as required. However, Torrington has not shown any distortions in Koyo's estimates and allocations. In fact, there can be little question that the data was adequate for Commerce's purposes because, based upon the data, Commerce was able to determine that one of Koyo's imported bearing models did not satisfy the one-percent threshold test. Commerce was satisfied with the information submitted by Koyo and the record reveals that Commerce fully addressed the concerns of Torrington.

Commerce, having accepted the information submitted by Koyo and Torrington having failed to show any distortions in Koyo's estimates and allocations, Commerce's decision to accept the estimates and allocations for the calculation of the "Roller Chain" percentage was reasonable and supported by substantial evidence and in accordance with law. This issue is hereby sustained.

### 14. *Use of Quantity as a Measure of Home Market Viability*

■ Torrington alleges that Commerce failed to achieve a fair or accurate comparison by calculating home market viability for NMB Singapore and NMB Thailand based on quantity alone. Because of the differences in possible diameters of the bearings under review, Torrington contends that Commerce should have determined viability based on weight rather than quantity. *Torrington's Brief* at 116–18, 131–33.

Commerce has determined that the number of bearings sold is usually the best measure of whether the home market for bearings is viable and, therefore, required NMB to report its sales upon this basis. *Defendant's Brief* at 61–65. In the final results Commerce stated:

NMB/Pelmec Thai and NMB/Pelmec Singapore correctly reported their viability ratios based on quantity rather than weight. Respondents are instructed by the questionnaire to use quantity as the basis for the ratio if the number of parts will not have a significant effect on the calculation.

*Final Results,* 57 Fed.Reg. at 28,424. NMB agrees with the position of Commerce. *NMB's Brief* at 33–36.

■ Commerce is required by the antidumping statute to determine whether the home market is viable (of a size suitable for making a comparison with the market for the merchandise in the United States). The preference of the statute is for comparisons of United States prices with prices in the home market. However, if the administering authority determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which subject merchandise is sold or offered for sale for exportation to countries other than the United States is used for comparison. The implementing regulation provides that if the quantity of such or similar merchandise sold during the period being examined for consumption in the home market country is so small in relation to third countries that it is an inadequate basis for FMV, Commerce will calculate FMV based on sales to a third country or on constructed value. 19 U.S.C. § 1677b(a)(1)(B) (1988); 19 C.F.R. § 353.48(a) (1992).

Both the statute and the regulations clearly provide that the determination of whether home market sales are adequate to form a basis for FMV shall be based on the quantity of merchandise sold in the home market. In the case at bar, Commerce did make this determination on the basis of quantity. There is nothing in the statute or regulation which supports Torrington's assertion that Commerce erred in using quantity rather than weight as a measure of home market viability.

Torrington maintains that the present case is analogous to *NMB Singapore Ltd., Pelmec Singapore Ltd. and NMB Corp. v. United*

*States,* 15 CIT 590, 594, 780 F.Supp. 823, 826 (1991). Torrington's reliance upon *NMB Singapore* is misplaced. The Court ruled there that the complex facts of that case permitted Commerce to test viability based on the five classes of bearings involved, but it did not justify the decision not to test parts separately from finished bearings. *Id.*

■ Commerce is afforded great latitude in the choice of methodology to be employed in antidumping investigations. *Mitsubishi Elec. Corp. v. United States,* 12 CIT 1025, 1050, 700 F.Supp. 538, 558 (1988), *aff'd,* 898 F.2d 1577 (Fed.Cir.1990). In this case the statute provides general guidance and leaves the application of a particular methodology to the administering authority. Commerce determined for these administrative reviews, that the number of bearings sold was usually the best measure of whether the home market for bearings was viable and, therefore, required NMB to report its sales upon this basis.

As long as Commerce's methodology was reasonable and there is substantial evidence in the record supporting Commerce's conclusions, the Court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology. *See Budd Co., Wheel & Brake Div. v. United States,* 15 CIT 446, 450, 773 F.Supp. 1549, 1553 (1991), *count dismissed, Borlem S.A.–Empreedimentos Industriais and FNV–Veiculos E Equipamentos S.A. v. United States,* 16 CIT 106, 786 F.Supp. 1031 (1992). This Court finds Commerce's use of quantity as a measure of home market viability was a reasonable means of measuring the viability of the home markets and therefore sustains Commerce on this issue.

### 15. *Foreign Trade Zone Entries*

■ Commerce did not require the collection of antidumping duty deposits on NMB Singapore merchandise entered into foreign trade zones and subsequently re-exported to third countries. *Final Results,* 57 Fed.Reg. at 28,424. Torrington contests this treatment. *Torrington's Brief* at 119–20.

Torrington alleges Commerce improperly determined that "entry" of merchandise pursuant to the antidumping law takes place only upon release of the merchandise into the U.S. customs territory and not upon its arrival into the geographic confines of the U.S. Torrington argues that as the focus of the antidumping law is on importation of subject merchandise and that importation occurs when merchandise enters the geographic U.S., the deposit of antidumping duties should occur upon entry of subject merchandise into FTZs. Therefore, Commerce should be required to collect antidumping duties upon the importation into a FTZ of merchandise subject to an antidumping duty order. *Id.*

Defendant responds by arguing that the reference to "entry" of merchandise in the antidumping statute unambiguously refers to the release of merchandise into the customs territory of the United States and does not refer to merchandise admitted into a FTZ. Commerce urges this Court to follow its recent decisions which have exempted foreign merchandise within a FTZ from the imposition of antidumping duties. *Defendant's Brief* at 65–67. Citing the same precedent, NMB agrees with Commerce's position. *NMB's Brief* at 36.

Torrington acknowledges the rulings contrary to its position, but maintains its arguments in order to preserve its right to appeal. *Torrington's Reply Brief* at 91.

This Court has previously ruled on this issue and adheres to its decision in *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1572; *see also Torrington Co. v. United States,* 17 CIT ——, ——, 826 F.Supp. 492, 494 (1993), *related proceeding,* 17 CIT ——, 823 F.Supp. 945 (1993). This Court finds that the Foreign Trade Zone statute on its face exempts foreign merchandise within a FTZ from the imposition of antidumping duties and from being subject to an antidumping administrative review until that merchandise is brought into the U.S. customs territory, unless some other provision of the Foreign Trade Zone statute or the regulations promulgated thereunder require otherwise. *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1572; *see also Torrington Co.,* 17 CIT at ——, 826 F.Supp. at 494. At the time of the imports in question, there was no statute or regulation that

required that antidumping duties be imposed on merchandise imported into a FTZ or that such merchandise must be subjected to an antidumping administrative review until the merchandise entered U.S. customs territory.

Subsequent to the imports at issue, the FTZ Board revised its regulations to provide that merchandise subject to an antidumping or countervailing duty order which enters an FTZ would be marked "privileged" and, thereby, subject to antidumping and countervailing duty laws. *See* 15 C.F.R. § 400.33(b)(2) (1992) (effective from April 6, 1992).[2]

The merchandise here involved, having been imported into the FTZs as "nonprivileged" merchandise, was transformed in the FTZs into articles not covered by the antidumping duty order and was therefore not subject to the antidumping order. Thus, Commerce's decision on this issue is in accordance with law and is hereby affirmed.

16. *Treatment of NMB Thailand's "Route B" Sales*

■ Torrington argues that Commerce should have excluded NMB Thailand's "Route B" sales from its home market database since they are not made in the ordinary course of trade. Torrington also states that Commerce's acceptance of "Route B" sales as a basis for foreign market value is inconsistent with agency precedent and unsupported by substantial evidence. Torrington cites to the original investigation wherein Commerce determined that "Route B" sales were considered third country sales because of the unusual circumstances surrounding them. *Torrington's Brief* at 121–27.

NMB asserts that it ships Thai-manufactured bearings to unrelated customers in the Thai home market via two routes. "Route A" merchandise is shipped within Thailand to unrelated customers. "Route B" merchandise is exported from Thailand and shipped to NMB's Singapore selling affiliate before being returned to Thailand for delivery to the unrelated customer. "Route B" shipments are made to comply with Thai governmental programs which exempt material inputs of merchandise manufactured in Thailand for exportation from certain import duties and taxes. NMB argues that under these programs only a small quantity of the finished merchandise can be shipped directly in Thailand (that is, via Route A). Since NMB's home market sales of bearings exceed this quantity, most bearings NMB sells to unrelated customers in Thailand are exported from Thailand to Singapore and then imported into Thailand. NMB argues that such exportation to comply with benefit programs is indeed "in the ordinary course of trade" in Thailand. *NMB's Brief* at 37–40.

Defendant states that in comparing prices in the United States and the home market, the antidumping statute provides that FMV must be based upon sales in the home market which are in the ordinary course of trade. 19 U.S.C. § 1677b(a)(1) (1988). Defendant asserts that, as Commerce verified during the original investigation and first administrative review, NMB Thailand knew that merchandise shipped through Singapore was ultimately destined for delivery and consumption in Thailand. *Defendant's Brief* at 67–70.

Defendant maintains that even though the sales were exported to Singapore prior to delivery to customers in Thailand, the first sale to an unrelated party occurred in Thailand. Therefore, Commerce decided to classify NMB Thailand's "Route B" sales as home market sales and include them in the home market database. Defendant further

---

**2.** Section 400.33(b), which became effective April 6, 1992, provides the following:

(b) *Restrictions on items subject to antidumping and countervailing duty actions*—(1) *Board policy.* Zone procedures shall not be used to circumvent antidumping (AD) and countervailing duty (CVD) actions under 19 CFR parts 353 and 355.

(2) *Admission of items subject to AD/CVD actions.* Items subject to AD/CVD orders or

items which would be otherwise subject to suspension of liquidation under AD/CVD procedures, if they entered U.S. Customs territory, shall be placed in privileged foreign status (19 CFR 146.41) upon admission to a zone or subzone. Upon entry for consumption, such items shall be subject to duties under AD/CVD orders or to suspension of liquidation, as appropriate, under 19 CFR parts 353 and 355.

states that the statute and applicable regulation instruct Commerce to consider the conditions and practices which, for a reasonable period prior to the time of exportation of subject merchandise, have been normal in the trade of merchandise of the same class or kind in the home market country. 19 U.S.C. § 1677(15) (1988); 19 C.F.R. § 353.46(b) (1992). Because NMB Thailand is subject to government restrictions upon the amount of merchandise it may ship directly to customers in Thailand, it has devised a method to circumvent those restrictions in order to increase its sales in the home market. Commerce argues it is perfectly logical, therefore, to recognize that the circumstances surrounding "Route A" and "Route B" sales will differ and to include "Route B" sales in the home market database. *Defendant's Brief* at 67–70.

In the original investigation Commerce stated:

With respect to the sales to Singapore that were reimported into Thailand, we found at verification that NMB/Pelmec Thai had knowledge that these sales were ultimately destined for delivery and consumption in Thailand. However, knowledge is only one factor that we considered in determining whether these sales are appropriately home market or third country sales. We also considered the other, unusual circumstances surrounding these transactions. For example, because these sales were exempt from certain taxes and import duties associated with other home market sales, the prices of these sales were not typical home market prices. In addition, the goods are physically exported from Thailand and the first sale to an unrelated party takes place in Singapore. Lastly, these sales earn export subsidies and are considered exports by the Government of Thailand for purposes of maintaining export statistics. All of these factors combined outweigh the importance of knowledge of the final destination in the determination of whether these sales are properly considered home market or third country sales. Therefore, *we have determined that these sales are appropriately considered third country sales.*

*Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand,* 54 Fed.Reg. 19,117, 19,-118–19 (May 3, 1989) (emphasis added).

This Court agrees that the circumstances surrounding "Route A" and "Route B" sales will differ. However, this Court has not been able to ascertain in the record why Commerce arrived at a different conclusion in this case than it did in the original investigation where Commerce determined that "Route B" sales were appropriately considered third country sales. In the final results of this review Commerce stated:

The Route B sales included in the HM database are properly classified as HM sales. The first sale to an unrelated party occurred in Thailand. These sales were accepted as HM sales and verified during the original investigation and first review, and no new information has been presented which would warrant their exclusion.

*Final Results,* 57 Fed.Reg. at 28,422.

Since Commerce's decision to accept "Route B" sales as home market sales is inconsistent with its decision in the original investigation and no explanation has been given on the record as to the reasons for the inconsistency, this Court finds that the decision is unsupported by substantial evidence and not in accordance with law. This Court hereby remands this case to Commerce to explain why it changed its findings. If no reasonable explanation can be given, then Commerce is to exclude the "Route B" sales from the home market database.

## 17. *NMB's Bonded Warehouse-to-Bonded Warehouse Sales*

■ Torrington claims that by accepting sales from NMB's bonded warehouse to customers' bonded warehouse ("bonded warehouse sales") as the basis for foreign market value, Commerce disregarded agency precedent and statutory and regulatory requirements because (1) it ignored the unusual circumstances surrounding bonded warehouse sales, indicating that the sales were not in the "ordinary course of trade," and (2) it ignored the fact that bonded warehouse sales were not destined for "home consumption." 19 U.S.C. § 1677b(a)(1) (1988); 19

C.F.R. § 353.46(b) (1992). Torrington asserts both Commerce, in the original investigation, and NMB recognized the unusual circumstances of these sales. Torrington cites to the original investigation wherein Commerce determined that bonded warehouse sales were considered third country sales because of the unusual circumstances surrounding them. *Torrington's Brief* at 127–31.

NMB argues that its bonded warehouse sales meet all of the requirements of 19 U.S.C. § 1677b(a)(1) in that they were sold "in the principal markets of the country from which exported, in usual commercial quantities and in the ordinary course of trade for home consumption." *NMB's Brief* at 40–41.

Defendant states that, although Commerce treated bonded warehouse sales in the original investigation as third country sales, Commerce accepted these sales in this and the previous administrative review as home market sales because they were made to an unrelated customer, whereas the bonded warehouse sales in the original investigation were made to a related party. Defendant states that Commerce did not treat NMB's bonded warehouse sales as home market sales in the original investigation because they were third country sales, not because Commerce found that these sales were outside the ordinary course of trade. Defendant argues that the only evidence offered by Torrington—its allegations that (1) import duties were not paid upon the raw materials and machinery used to produce the underlying merchandise and (2) NMB made these sales to avoid home market sales quantity restrictions—fails to demonstrate that NMB's bonded warehouse sales were not made within the ordinary course of trade. *Defendant's Brief* at 70–75.

In the original investigation Commerce stated:

A large percentage of NMB/Pelmec Thai's home market sales of ball bearings are made from its own bonded warehouse to the bonded warehouse of a related original equipment manufacturer (OEM) in Thailand. Bonded warehouses in Thailand are by their very nature for exportation and, as such, bonded warehouse sales between related parties cannot be considered domestic sales.

*Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand*, 54 Fed.Reg. at 19,119.

In the original investigation, Commerce determined that sales from NMB Thailand's bonded warehouse to the bonded warehouse of a related entity should be considered third country sales. *Id.* In contrast, the sales at issue in the current review are sales to an unrelated customer in Thailand. Thus, bonded warehouse-to-bonded warehouse sales were accepted in the first review, and have not been excluded from the home market database for these final results either. *Final Results*, 57 Fed.Reg. at 28,422.

■ Torrington bears the burden of proving whether the bonded warehouse sales are outside the ordinary course of trade and were not for home consumption. *See Nachi–Fujikoshi Corp. and Nachi Am., Inc. v. United States*, 16 CIT 606, 608, 798 F.Supp. 716, 718 (1992). Torrington alleges that NMB conceded that bonded warehouse sales could be destined for export, because NMB could not confirm that its customers consumed the merchandise domestically. However, the fact that bonded warehouse sales could be destined for export has no bearing as to whether the bonded warehouse sales were made in the ordinary course of trade. Furthermore, the facts that import duties on raw materials and machinery may not have been paid on bonded warehouse sales and that NMB may have made the bonded warehouse sales to avoid home market sales quantity restrictions are also irrelevant. Torrington has failed to explain why or how the duty-free status of the materials and machinery used to produce the merchandise or why NMB's motivation of avoiding home market sales quantity restrictions caused the sales to be outside the ordinary course of trade.

Commerce having set forth adequate reasons for its decision to accept NMB's bonded warehouse sales as being made in the ordinary course of trade and for home consumption, and Torrington having failed in its burden to prove otherwise, this Court finds that Commerce's decision that NMB's bonded

warehouse sales were made in the ordinary course of trade and for home consumption and its treatment of NMB's bonded warehouse-to-warehouse sales as home market sales is supported by substantial evidence contained in the administrative record and is in accordance with law. Therefore, this Court hereby affirms this issue.

18. *USP Adjustment for Uncollected Or Rebated Duties and Taxes*

■ Torrington argues that NMB Thailand failed to adequately substantiate its claim for adjustments to USP for three types of uncollected or rebated duties and taxes. Torrington asserts that Commerce's acceptance of NMB's claimed adjustment is also contrary to the decisions of this Court and not supported by substantial evidence. Torrington asserts there must be evidence of actual payment of the taxes and duties and of actual rebates of the same. *Torrington's Brief* at 134–36.

Commerce argues it properly determined that NMB Thailand provided sufficient evidence to support its claim for import-duty drawback and indirect tax adjustments to USP. Commerce asserts it was satisfied that the Thai duty drawback and business tax schemes, as evidenced by Thai law and NMB's documents, sufficiently established NMB's claim for adjustments pursuant to 19 U.S.C. § 1677a(d)(1)(B) and (C) (1988). *Defendant's Brief* at 75–81.

NMB Thailand asserts it has actually provided the very information Torrington alleges NMB failed to provide, namely, the payment of duties and taxes on material inputs. *NMB's Brief* at 42.

■ In accordance with 19 U.S.C. § 1677a(d)(1)(B), Commerce is required to increase USP by the amount of any import duties imposed by the country of exportation which have been rebated or which have not been collected, by reason of the exportation of the merchandise to the United States. In determining whether a duty drawback adjustment is justified, Commerce must determine whether the foreign country makes entitlement to the rebate dependent upon the payment of import duties and whether the

company claiming the adjustment can demonstrate that there were sufficient imports of raw materials to account for the duty drawback received upon exports of merchandise. However, there is no requirement that the specific input be traced from importation through exportation before allowing drawback on duties paid. *Far East Machinery Co. v. United States,* 12 CIT 972, 974–79, 699 F.Supp. 309, 311–15 (1988).

The indirect tax provision of the antidumping statute, 19 U.S.C. § 1677a(d)(1)(C), requires Commerce to increase USP by the amount of any taxes imposed in the country of exportation directly upon the exported merchandise, which have been rebated or not collected by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.

In the final results, Commerce found:

> Based on the information provided in NMB/Pelmec Thai's questionnaire response, we have accepted its claim for an adjustment for these expenses. NMB/Pelmec Thai has provided adequate information to support its claim for this adjustment.

*Final Results,* 57 Fed.Reg. at 28,420.

NMB Thailand, in its questionnaire response, explained:

> Thailand has a duty collection system comparable to the bonded warehouse system in the U.S. Under the Thai system, materials and parts may be imported free of import duties and business and municipal taxes provided that they are processed into goods which are exported. All of the materials and parts which we use in the manufacture of subject merchandise are imported under this system. When such subject merchandise is sold in the home market, however, the exempted import duties and business and municipal taxes must be paid.

*NMB Thailand Section B Questionnaire Response, AR Doc. No 26 at 27–28.* The import duty rates for the major materials and parts as well as the business tax rate applicable to

imports and the municipal tax rate were also provided by NMB Thailand. *Id.*

With regard to uncollected business and municipal taxes on sales, NMB Thailand stated in its Section B Questionnaire Response that under the Thai tax system business and municipal taxes are imposed on the sales of goods in the home market but not on their exportation. With respect to home market sales, a business tax is levied on the gross receipts of the seller at a rate that depends on the type of goods sold. For the subject merchandise, the normal rate of business tax is 9%. NMB also stated that a municipal tax is similarly levied on the gross receipts of the seller, but at a fixed rate of 10% of the amount of the business tax. NMB also discussed its eligibility for a reduced tax rate contingent upon Thai government approval. With regard to the rebated indirect taxes and import duties, NMB Thailand stated that the law permits exporters to apply for and receive tax certificates, which are freely transferrable, as rebates of indirect taxes and import duties inputs into products that are exported. *Id.* at 28–29.

To support these claims, NMB submitted English translations of the Thai duty drawback legislation and the Thai tax legislation. *See AR Doc. No 26 at 26–31.*

Based on the record, this Court finds that Torrington's claim that NMB did not provide any evidence to establish that it was entitled to duty drawback adjustment to U.S. price is without merit.

Based on the documentation provided by NMB and other evidence contained in the record, this Court finds that Commerce reasonably determined that NMB's duty drawback and indirect tax claims were justified in accordance with 19 U.S.C. § 1677a(d)(1)(B) and (C) and sustains Commerce's adjustment of USP to include uncollected or rebated duties and taxes for NMB Thailand.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce for: (1) application of the rate of value added tax forgiven to United States price, calculated at the same point in the stream of commerce where the value added tax is applied for home market sales, and addition of the resulting amount to United States price, without a circumstance of sale adjustment to foreign market value; (2) denial of the adjustment to foreign market value for home market pre-sale freight expenses where foreign market value was calculated using purchase price; (3) development of a methodology which removes post-sale price adjustments and rebates paid on sales of out-of-scope merchandise from any adjustments made to foreign market value for post-sale price adjustments or rebates or, if no viable method can be developed, to deny such an adjustment in its calculation of foreign market value; (4) addition of an amount for profit which is not less than the statutory eight percent minimum to FAG–Italy's cost of production data and any adjustments to constructed value that may be required as a result; (5) addressing the issues raised by plaintiff concerning NTN's adjustment for inventory carrying costs to foreign market value and for setting forth the basis for its determination; and (6) a reasonable explanation as to why Commerce changed its finding in the original investigation that "Route B" sales are third country sales or, if none can be given, for exclusion of these sales from the home market database. Commerce is sustained as to all other issues.

Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

ORDERED that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), for (1) application of the rate of value added tax forgiven to United States price, calculated at the same point in the stream of commerce where the value added tax is applied for home market sales, and addition of the re-

sulting amount to United States price, without a circumstance of sale adjustment to foreign market value; (2) denial of the adjustment to foreign market value for home market pre-sale freight expenses where foreign market value was calculated using purchase price; (3) development of a methodology which removes post-sale price adjustments and rebates paid on sales of out-of-scope merchandise from any adjustments made to foreign market value for post-sale price adjustments or rebates or, if no viable method can be developed, to deny such an adjustment in its calculation of foreign market value; (4) addition of an amount for profit which is not less than the statutory eight percent minimum to FAG–Italy's cost of production data and any adjustments to constructed value that may be required as a result; (5) addressing the issues raised by plaintiff concerning NTN's adjustment for inventory carrying costs to foreign market value and for setting forth the basis for its

determination; and (6) a reasonable explanation as to why Commerce changed its finding in the original investigation that "Route B" sales are third country sales or, if none can be given, for exclusion of these sales from the home market database; and it is further

ORDERED that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.

