The **TORRINGTON COMPANY, Plaintiff and Defendant–Intervenor,**

v.

The **UNITED STATES, Defendant, SKF USA INC. and SKF SVERIGE AB, Defendants–Intervenors and Plaintiffs.**

Slip Op. 97–29.
Court No. 95–03–00345.

United States Court of International Trade.

March 7, 1997.

Stewart and Stewart (Terence P. Stewart, Washington, DC, Wesley K. Caine, McLean, VA, Geert De Prest and Lane S. Hurewitz, Washington, DC), for plaintiff and defendant–intervenor The Torrington Company.

Howrey & Simon (Herbert C. Shelley, Alice A. Kipel, Anne Talbot and Patricia M. Steele, Washington, DC), for defendants-intervenors and plaintiffs SKF USA Inc. and SKF Sverige AB.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis); of counsel: Mark A. Barnett, Michelle K. Behaylo, Stacy J. Ettinger, Thomas H. Fine, Dean A. Pinkert and David J. Ross, Attorney–Advisors, Washington, DC, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

### *OPINION*

TSOUCALAS, Senior Judge.

Plaintiff and defendant-intervenor The Torrington Company ("Torrington") moves this Court pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging aspects of the final determination of the Department of Commerce, International Trade Administration ("Commerce"), of the fourth administrative review of antifriction bearings ("AFBs") from Sweden, entitled *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders ("Final Results")*, 60 Fed.Reg. 10,900 (1995). Defendant-intervenors and plaintiffs SKF USA Inc. and SKF Sverige AB (collectively "SKF") also challenge the fourth administrative review of AFBs from Sweden.

### *Background*

On May 15, 1989, Commerce published the antidumping duty orders on AFBs from Sweden. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Parts Thereof From Sweden*, 54 Fed.Reg. 20,907 (1989). The fourth administrative review encompasses imports of AFBs entered during the period of May 1, 1992 through April 30, 1993. *See Final Results*, 60 Fed. Reg. at 10,900. The present consolidated action concerns imports from Sweden.

On February 28, 1994, Commerce published the preliminary results of the fourth administrative review. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, Thailand, and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Notice of Intent To Revoke Orders (in Part)*, 59 Fed.Reg. 9,463 (1994). On February 28, 1995, Commerce published the Final Results at issue. *See Final Results*, 60 Fed.Reg. at 10,900.

Torrington contests the following actions of Commerce: (1) refusing to apply the reimbursement regulation; (2) using below cost sales in its calculation of profit for constructed value; (3) resorting to constructed value where sales were made below cost without considering other similar models; and (4) adjusting foreign market value ("FMV") for pre-sale inland freight expenses.

SKF claims that Commerce erred in: (1) failing to apply a tax-neutral methodology in computing the value-added tax ("VAT") adjustment; (2) treating certain home market sales as related party sales; and (3) adopting an incorrect "all others" rate for ball bearings from Sweden.

On May 3, 1995, the Court granted Torrington's motion for a preliminary injunction enjoining the liquidation of the subject entries during the pendency of this litigation.

### *Discussion*

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Reimbursement Regulation*

In the Final Results, Commerce refused to apply 19 C.F.R. § 353.26 (1995), the so-called "reimbursement regulation," for the following reasons:

> We disagree with Torrington ... that the Department should deduct from ESP [exporter's sales price] antidumping duties allegedly reimbursed by foreign producers to their U.S. affiliates. In this administrative review neither party has identified record evidence that there was reimbursement of antidumping duties. Evidence of reimbursement is necessary before we can make an adjustment to USP [U.S. price]. This has been our consistent interpretation of 19 C.F.R. 353.26, the reimbursement regulation, and was upheld by the Court in *Outokumpu Copper Rolled Products AB v. United States,* 17 CIT 848, 829 F.Supp. 1371 (1993).
>
> . . . .
>
> We also disagree with Torrington ... that the amount of antidumping duties assessed on imports of subject merchandise constitutes a selling expense and, therefore, should be deducted from ESP.

60 Fed.Reg. at 10,907.

Torrington argues Commerce erred by failing to apply the reimbursement regulation in all instances where (1) transfer prices between related exporters and importers were less than the cost of production plus profit, or, alternatively, cost of production, and (2) actual dumping margins were found.

Torrington's Mem. Supp. Mot. J. Agency R. at 12–21. In the alternative, Torrington insists that Commerce should have at least further investigated the possible reimbursement. *Id.* at 21–22.

In response, Commerce states that there is no evidence in the administrative record that the exporter paid duties or reimbursed the related importer through alleged intra-company transfers. Commerce further argues that mere allegations that intra-company transfers were actually reimbursements of antidumping duties are insufficient to require Commerce to investigate the transfers. Commerce does request a remand, however, to explain the circumstances in which Commerce would apply the regulation in an ESP situation. Def.'s Partial Opp'n to Mots. J. Agency R. at 41–44.

The Court has already addressed this issue in previous cases dealing with the same administrative review. The Court found that Torrington failed to provide sufficient evidence of a link between intracorporate transfers and the reimbursement of antidumping duties to warrant requiring Commerce to commit resources to conduct an investigation. *INA Walzlager Schaeffler KG v. United States,* 21 CIT ——, —— – ——, 957 F.Supp. 251, 296–70 (1997); *FAG Italia S.p.A. v. United States,* 20 CIT ——, ——, 948 F.Supp. 67, 74–75 (1996); *Torrington Co. v. United States,* 20 CIT ——, ——, 944 F.Supp. 930, 933–34 (1996). The Court did grant Commerce a remand, however, to explain the circumstances in which it will apply the regulation in an ESP situation. *INA Walzlager,* 21 CIT at —— – ——, 957 F.Supp. at 269–70, ; *FAG Italia,* 20 CIT at ——, 948 F.Supp. at 75; *Torrington,* 20 CIT at ——, 944 F.Supp. at 934.

■ Torrington's alternative argument lacks merit as well. Torrington demands an investigation of reimbursement based on evidence that is admittedly weak. In fact, Torrington acknowledges that the evidence it provided to Commerce related to "indirect" transfers. *See* Torrington's Reply to Opp'n to Mot. J. Agency R. at 7. The evidence submitted by Torrington amounts to no more than "mere allegations" that cannot support

requiring Commerce to investigate the transfers between related parties. *See Torrington Co. v. United States,* 19 CIT ——, —— —— ——, 881 F.Supp. 622, 631–32 (1995).

Accordingly, the Court sustains Commerce's decision not to apply the reimbursement regulation to adjust USP. The Court remands this issue to Commerce, however, to explain the circumstances in which it will apply the regulation in an ESP situation.

### 2. *Calculation of Profit for Constructed Value*

Torrington claims Commerce should not have included below-cost sales in calculating profit for constructed value. According to Torrington, the inclusion of such sales seriously distorts the statutory framework since below-cost sales are excluded when sales form the basis of FMV pursuant to 19 U.S.C. § 1677b(b) (1988). Torrington contends the same sales should be disregarded when constructed value serves as FMV. Torrington's Mem. Supp. Mot. J. Agency R. at 22–29.

In the alternative, Torrington argues that even if the Court concludes below-cost sales were properly included in the constructed value calculations, Commerce should have recomputed respondents' profits on the basis of the sample sales reported. Torrington submits that Commerce should have presumed profit based on sales of such or similar merchandise as reported by the respondents would be representative of the profit for the general class or kind of merchandise, and should have used the derived profit figures if they were higher than the statutory minimum of eight percent. *Id.* at 29–32.

Commerce responds that neither the definition of "constructed value" as provided in 19 U.S.C. § 1677b(e)(1)(B) (1988) nor the definition of "ordinary course of trade" contained in 19 U.S.C. § 1677(15) (1988) contains language suggesting that below-cost sales are to be considered outside the ordinary course of trade and, therefore, excluded from the profit calculation for constructed value. Def.'s Partial Opp'n to Mots. J. Agency R. at 44–48. In addition to rejecting Torrington's contention that below-cost sales are *per se* outside the ordinary course of trade, Commerce argues that Torrington failed to present any other evidence indicating that the below-cost sales were indeed outside the ordinary course of trade. *Id.* at 48–49.

Commerce also rebuts Torrington's alternative argument by stating that pursuant to its broad authority under 19 U.S.C. § 1677f–1 (1988) to use sampling, Commerce properly determined that the amount of profit calculated on the basis of such or similar merchandise would not be the appropriate basis for determining profit for the class or kind of merchandise involved. Def.'s Partial Opp'n to Mots. J. Agency R. at 50–52.

■ Again, this issue is one previously addressed by the Court. This Court has recently concluded in several cases that for below cost sales to be excluded from a constructed value calculation, a petitioner must show that sales were made outside the ordinary course of trade. *INA Walzlager,* 21 CIT at —— —— ——, 957 F.Supp. at 270–71; *FAG Italia,* 20 CIT at ——, 948 F.Supp. at 75; *FAG U.K. Ltd. v. United States,* 20 CIT ——, ——, 945 F.Supp. 260, 269 (1996); *Torrington,* 20 CIT at ——, 944 F.Supp. at 934–35; *Timken Co. v. United States,* 20 CIT ——, ——, 930 F.Supp. 621, 624–25 (1996); *Federal–Mogul Corp. v. United States,* 20 CIT ——, ——, 918 F.Supp. 386, 403 (1996); *Torrington,* 19 CIT at ——, 881 F.Supp. at 633. In the case at bar, *Torrington* has failed to demonstrate the below-cost sales at issue were indeed outside the ordinary course of trade. Therefore, Commerce's decision to include below-cost sales in calculating profit for constructed value purposes is supported by the agency record and law.

The Court has also addressed and rejected Torrington's alternative argument. In *Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 403–04, the Court held that while Commerce has the authority to select appropriate samples for determining USP and FMV pursuant to 19 U.S.C. § 1677f–1 (1988),[1] Commerce also has the discretion not to use samples at

---

1. 19 U.S.C. § 1677f–1(b) states:
The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.

all. *See also INA Walzlager,* 21 CIT at ——, 957 F.Supp. at 270–71. Consequently, Torrington's alternative argument lacks merit as well and the Court sustains Commerce on this issue.

### 3. *Use of Constructed Value*

Torrington contends Commerce erred by resorting to constructed value after finding the most similar home market model was sold below cost in more than 90 percent of the home market sales without first determining whether there were any similar models to serve as priced-based comparisons. Torrington insists the statute indicates a preference for sales over costs comparisons. Torrington's Mem. Supp. Mot. J. Agency R. at 32–37.

Commerce responds that 19 U.S.C. § 1677b(b) directs Commerce to resort to constructed value after disregarding home market sales of "matched" bearings made below the cost of producing the merchandise in substantial quantities over an extended period of time. Def.'s Partial Opp'n to Mots. J. Agency R. at 54–59.

The Court has addressed this issue and concluded that Commerce's methodology is consistent with the statute. *See INA Walzlager,* 21 CIT at ——, 957 F.Supp. at 271; *Federal–Mogul,* 20 CIT at —— – ——, 918 F.Supp. at 396–97; *see also Torrington,* 20 CIT at ——, 944 F.Supp. at 935–36; *FAG U.K.,* 20 CIT at ——, 945 F.Supp. at 270. In *Federal–Mogul,* the Court held "[t]here is no requirement in 19 U.S.C. § 1677b(b) that Commerce first investigate whether it can make another match based on the next most similar merchandise before resorting to constructed value." 20 CIT at ——, 918 F.Supp. at 397. Based on the Court's prior decisions, Commerce is sustained on this issue.

### 4. *Adjusting FMV for Pre–Sale Inland Freight*

In spite of the decision of the United States Court of Appeals for the Federal Circuit ("CAFC") in *Torrington Co. v. United States,* 68 F.3d 1347, 1356 (Fed.Cir.1995), holding that Commerce may deduct indirect home market transportation expenses from FMV pursuant to the ESP offset cap, Tor-

rington contests Commerce's decision to adjust FMV for pre-sale inland freight expenses. Torrington's Mem. Supp. Mot. J. Agency R. at 37–38. Since the filing of these briefs, the CAFC has reaffirmed its position on this issue. *See Torrington Co. v. United States,* 82 F.3d 1039, 1047 (Fed.Cir.1996). Therefore, in light of the decisions of the CAFC, the Court finds Commerce's actions to be consistent with law.

### 5. *Value–Added Tax Adjustment*

SKF requests a remand for Commerce to apply a tax-neutral amount rather than rate methodology in computing the VAT adjustment. SKF's Mem. Supp. Mot. J. Agency R. at 21–36. Commerce agrees that a remand would be appropriate so that it may apply a tax-neutral methodology. Def.'s Partial Opp'n to Mots. J. Agency R. at 10–11. Torrington does not object to a remand on this issue. Torrington's Opp'n to Mot. J. Agency R. at 6.

In light of the decision of the CAFC in *Federal–Mogul Corp. v. United States,* 63 F.3d 1572 (Fed.Cir.1995), which upheld Commerce's application of a tax-neutral methodology, the Court agrees with the parties that a remand is appropriate. Therefore, this case is remanded to Commerce to apply its tax-neutral methodology.

### 6. *Exclusion of SKF's Related Party Sales*

In the Final Results, Commerce excluded certain home market related party sales from its calculation of FMV after concluding that "the average prices of certain models sold to related parties [were] not comparable to the average prices of these models sold to unrelated parties." 60 Fed.Reg. at 10,946. Commerce also excluded related party sales from its calculation of profit for constructed value. *Id.* at 10,922.

SKF challenges Commerce's conclusion that certain home market customers were related to SKF. AB Investor, as conceded by SKF, has a 38.9 percent interest in the voting shares of AB SKF, which in turn owns 100 percent of SKF Sverige. SKF's Mem. Supp. Mot. J. Agency R. at 41. SKF admits that AB Investor meets the definition of a

related party, as provided in 19 U.S.C. § 1677(13)(D) (1988), as it holds more than 20 percent of the voting shares in SKF's home market customers SAAB Scania, Stora, Atlas Copco, Electrolux and Ericsson (collectively "the Five Companies"). *Id.* However, SKF points to record evidence to support its contention that AB Investor was not in a position to influence prices. According to SKF, AB Investor does not exercise any control over the business of SKF Sverige. Thus, SKF maintains that Commerce's treatment of the Five Companies as related parties, while technically consistent with statutory requirements, contravenes the purpose of the statute which is to identify situations in which prices may be manipulated. *Id.* at 41–44.

Assuming *arguendo,* that Commerce properly concluded SKF Sverige was related to the Five Companies, SKF asserts that Commerce improperly treated two companies— Astra and Asea Brown Boveri ("ABB")—as related to SKF Sverige. SKF highlights evidence indicating that AB Investor owns only ten percent of the voting stock of ABB. In accordance with this evidence, SKF alleges that Commerce determined ABB was not related to SKF Sverige but, nevertheless, excluded SKF Sverige's sales to all ABB customers for purposes of determining FMV. *Id.* at 45–46. In addition, SKF states that no evidence exists on the record regarding any holding by AB Investor in Astra. *Id.* at 46.

SKF also objects to Commerce's application of the arm's-length test because it allegedly fails to determine whether the relationship through common ownership actually affected prices. Commerce's test, according to SKF, ignores degrees of ownership and, therefore, degrees of influence. As a remedy, SKF urges the Court to require Commerce to analyze the sales of related parties on a company-specific basis. SKF emphasizes the fact that while it raised this concern at the administrative level, Commerce failed to address SKF's arguments in the Final Results. Furthermore, SKF disputes the accuracy of the arm's-length test because Commerce included ABB and Astra on the list of related parties. SKF's final contention regarding the arm's-length test is

that the test does not consider quantity in spite of SKF's insistence that SKF's prices were affected by sales quantity. *Id.* at 48–63.

Finally, SKF asserts that Commerce deviated from past practice, without explanation, by excluding related party sales from the calculation of profit for constructed value. Even if Commerce's exclusion was proper, SKF claims the arm's-length test was not applicable because profit, not price, was the element of value to be considered pursuant to 19 U.S.C. § 1677b(e)(2). *Id.* at 63–65.

In response, Commerce emphasizes that each of the Five Companies meets the statutory definition of a related party. Commerce submits that the issue of whether the relationship between the parties influenced price is determined through the application of the arm's-length test and is irrelevant to the initial determination of whether the parties are indeed related. Commerce emphasizes that SKF cites neither statutory language nor legislative history requiring Commerce to investigate SKF's financial relationships. Def.'s Partial Opp'n to Mots. J. Agency R. at 14–16.

Regarding Astra, Commerce concedes that AB Investor may not have twenty percent of the voting power, but insists that record evidence (an article in *Business Week*) indicates that AB Investor owns significant holdings in Astra. Commerce states that SKF failed to provide information regarding the percentage of voting shares of Astra held by AB Investor in spite of Commerce's specific request to provide such information for any company to which SKF sold its AFBs. Therefore, Commerce states that it relied upon an adverse inference in reaching its decision to treat Astra as a related party. *Id.* at 17–18.

Commerce requests a remand, however, to correct the related party analysis and margin calculation in order to treat ABB as unrelated to SKF. Commerce admits that because AB Investor controls less than twenty percent of ABB's voting shares, ABB is not a related party. *Id.* at 19.

Commerce defends the application of its arm's-length test and insists that SKF presented no factual or legal arguments at the

administrative level to persuade Commerce to alter its methodology. Therefore, Commerce insists that SKF failed to exhaust its administrative remedies. *Id.* at 20–22. In the alternative, Commerce asserts that SKF did not establish any relationship between quantity and price. *Id.* at 22–25. Commerce concedes, however, that if the Court finds that SKF did exhaust administrative remedies, this issue should be remanded to Commerce so that it may determine whether the application of a company-specific arm's length test is warranted. *Id.* at 22.

Finally, Commerce addresses the calculation of profit for constructed value concern by arguing that SKF is essentially seeking an advisory opinion on this issue because SKF has failed to demonstrate that the exclusion of related party sales for the calculation of profit for constructed value affected SKF's margins. *Id.* at 25–27. Alternatively, Commerce counters that in the Final Results it sufficiently explained its decision to depart from prior practice. With regard to the inclusion of ABB and Astra in these calculations, Commerce insists it properly treated Astra as a related party but requests a remand to treat ABB as an unrelated customer for all purposes. *Id.* at 27–29.

Torrington essentially agrees with the positions taken by Commerce. Torrington's Opp'n to Mot. J. Agency R. at 9–14.

In rebuttal, SKF argues that Commerce's explanation of its reasons for treating Astra as a related party was not in either the preliminary analysis memorandum or the Final Results. As such, SKF urges the Court to reject Commerce's *post hoc* rationalizations. SKF's Reply to Opp'n to Mot. J. Agency R. at 28–31. Furthermore, SKF claims that Commerce may not presume that Astra is a related party based upon an adverse inference. *Id.* at 31–36.

Regarding the arm's-length test, SKF emphasizes that it adequately raised its objections to the test in its case brief during the proceedings below to satisfy the exhaustion requirements. *Id.* at 39–42.

Finally, SKF insists that the issue of excluding related party sales from the calculation of profit for constructed value may be addressed by the Court without a prior showing of an effect on the margin. *Id.* at 44–47.

### a. *The Five Companies, Astra and ABB*

The definition of a related party pursuant to 19 U.S.C. § 1677(13)(D) is as follows:

any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.

Commerce's regulations instruct Commerce to use a related party sale in its calculations of FMV "only if satisfied that the price is comparable to the price at which the producer or reseller sold such or similar merchandise to a person not related to the seller." 19 C.F.R. § 353.45(a) (1995).

The Court will first address the issue concerning the Five Companies. As SKF concedes, each of the Five Companies falls within the statutory and regulatory definitions of a "related party." SKF primarily relies upon Commerce's actions in the administrative determination, entitled *Antidumping; Final Determination of Sales at Not Less Than Fair Value; Certain Forged Steel Crankshafts From Japan ("Crankshafts")*, 52 Fed.Reg. 36,984, 36,985–86 (1987), to support its assertion that Commerce should consider the underlying purpose of 19 U.S.C. § 1677(13)(D). In *Crankshafts,* Commerce refused to treat two companies as related where a number of companies, in aggregate, owned over twenty percent of the two relevant companies. In rejecting the petitioner's argument that the companies should be treated as related, Commerce stated the following:

The petitioner's interpretation of section 771(13)(D) [of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(13)(D) ] would lead to absurd results in this instance where common shareholders are not capable of effecting what the provision intended to prevent—the shifting of selling expenses

in order to influence prices. Under petitioner's interpretation, any two publicly traded companies would have to be considered related if any number of individuals or companies that owned shares in both, owned, in the aggregate, 20 percent of each company.

52 Fed.Reg. at 36,986. The facts in this case do not resemble those of *Crankshafts.* In *Crankshafts,* Commerce rejected the petitioner's interpretation of the statute and, in so doing, relied on the underlying purpose of the statute. In contrast, the issue presently before the Court does not involve questionable statutory interpretation. As SKF concedes, each of the Five Companies individually meets the statutory requirements for being labeled a related party. Since AB Investor owns a 38.9 percent interest in the voting shares of AB SKF (which owns 100 percent of SKF Sverige) and more than 20 percent of the voting shares in each of the Five Companies, there is no issue regarding Commerce's interpretation of the statute. *See* SKF's Supplemental Questionnaire Response, P.R. Doc. No. 35, SKF's App., Ex. 4, at 2. Commerce simply applied the definition stated in 19 U.S.C. § 1677(13)(D). To engage in the analysis suggested by SKF, the Court would have to ignore the language of the statute in favor of applying a more complicated and fact-specific inquiry. Requiring Commerce to look beyond the financial relationships of the companies at this stage would obviate the need for a statute setting forth specific guidelines for determining whether parties are indeed related. Section 1677(13)(D) provides a bright-line test for defining related parties. Commerce followed the guidelines and properly treated the Five Companies as related to SKF Sverige.

■ Commerce's treatment of Astra as a related company, however, raises different concerns. In reviewing Commerce's actions, the Court is restricted to the administrative record and the evidence contained therein. *Atcor, Inc. v. United States,* 11 CIT 148, 154, 658 F.Supp. 295, 300 (1987). The Court will not accept *post hoc* rationalizations in place of evidence on the agency record. *Id.; see also Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239,

245–46, 9 L.Ed.2d 207 (1962). There is insufficient evidence in the administrative record before the Court to support Commerce's treatment of Astra. The only record of AB Investor's holdings in Astra is an article published in *Business Week* prior to the issuance of the supplemental questionnaire. *See Business Week,* Aug. 9, 1993, at 76, P.R. Doc. No. 73, Def.'s App., Ex. 1. In that article, the author valued AB Investor's shares in Astra at one billion dollars. *See id.* There is no indication in the article of the percentage of voting stock owned by AB Investor. Furthermore, Commerce made no reference to the article or any other basis for treating Astra as a related company in the Final Results. In reference to its decision to treat certain companies as related, Commerce merely stated that it "preliminarily determined that SKF–Sweden made HM [home market] sales to [related parties]." 60 Fed. Reg. at 10,946. Commerce did not mention—as it does in its brief before the Court—a decision to make an adverse inference regarding AB Investor's holdings in Astra. Due to the lack of any record evidence indicating that AB Investor had control of at least 20 percent of Astra's voting stock, and any reference by Commerce to applying an adverse inference against SKF, the Court cannot sustain Commerce's treatment of Astra. Thus, this issue is remanded to Commerce to treat Astra as an unrelated company.

Regarding ABB, the record indicates that AB Investor held only 10 percent of the voting power in that company. SKF's Supplemental Questionnaire Response, P.R. Doc. No. 35, SKF's App., Ex. 4, at 2. ABB does not meet the statutory definition of a related party and, therefore, Commerce appropriately agrees with SKF's remand request to treat ABB as unrelated to SKF. Therefore, this case is remanded for Commerce to correct the margin calculation to reflect that ABB is unrelated to SKF.

b. *Arm's–Length Test*

■ Turning to the application of the arm's-length test, the Court notes at the outset that SKF raised this issue at the administrative level. In its case brief sub-

mitted on March 21, 1994, SKF criticized the arm's-length test because Commerce "did not individually analyze the companies involved and did not consider the relative quantities involved." SKF's Case Brief of March 21, 1994, P.R. Doc. No. 66, SKF's App., Ex. 7, at 3. SKF further stated, "[i]n light of the nature of the ownership interest, the lack of control and the absence of a sufficient price comparison, the Department should not exclude the affected transactions." *Id.* These statements were sufficient to satisfy the exhaustion requirement. Therefore, the Court will now address the merits of SKF's concerns.

▆▆▆ Consistent with the appropriate deference this Court must afford Commerce, the Court will uphold Commerce's arm's-length test unless it is unreasonable. In *Usinor Sacilor v. United States,* 18 CIT 1155, 1158, 872 F.Supp. 1000, 1004 (1994), the Court rejected Usinor's claim that Commerce should have considered quantity in its arm's-length analysis for the following reasons:

Usinor has failed to demonstrate that application of Commerce's test resulted in actual distortion of price comparability. Usinor is unable to point to any record evidence showing that its products were sold at different prices for different quantities, or that Commerce actually compared Usinor's sales to related parties in larger quantities and at lower prices, with its sales to unrelated parties in smaller quantities and at higher prices. Although Usinor had quantity discount price lists for various products, the record shows that the actual sales prices were determined by Usinor's negotiation with individual customers, and not based solely on quantity levels.

Similar to Usinor, SKF has failed to point to record evidence providing a direct link between prices and quantity. The tables provided by SKF indicating that transactions involving higher quantities were, on average, made at lower prices, does not sufficiently show that the difference in price was due to quantity because SKF does not rule out other factors as causes for the differential. In fact, SKF admits that quantity is not the sole element affecting price. *See* SKF's Mem. Supp. Mot. J. Agency R. at 58–59. While the Court will not go as far as to require a respondent to demonstrate that quantity is the sole factor affecting price, the respondent must do more than indicate a possible correlation between price and quantity. Based on the record, Commerce's decision not to consider quantity in conducting its arm's-length test is reasonable. However, as Commerce concedes, in the past Commerce has applied its arm's-length test on a company specific basis. Commerce failed to consider a company-specific approach in this case and, therefore, this case is remanded to Commerce to determine whether such a test is warranted and, if so, to apply that test.

### c. *Calculation of Profit for Constructed Value*

Finally, Commerce's decision in this review to exclude related party sales from the calculation of profit for constructed value was recently upheld by this Court in *INA Walzlager,* 21 CIT at ——, 957 F.Supp. at 259. In that case, the Court upheld the methodology as it was applied to INA, the one respondent whose profit on sales to unrelated parties was greater than eight percent.[2] While INA's objection to the exclusion of related parties sales was based on different arguments than those of SKF, the Court recognized in *INA Walzlager,* 21 CIT at ——, 957 F.Supp. at 259, that 19 U.S.C. § 1677b(e)(2) grants Commerce the authority to disregard a related party sale if any amount representing an element of that sale—in this case, profit—"does not fairly reflect the amount usually reflected in sales in the market under consideration." Commerce cited this provision in the Final Results to justify its decision to exclude SKF's related party sales from the constructed value calculation. *See*

---

**2.** INA specifically objected to the use of the arm's-length test and variance test as it was applied to INA. *INA Walzlager,* 21 CIT at ——, 957 F.Supp. at 257. INA also challenged Commerce's selection of profit earned on home market sales as best evidence available once Com-

merce decided to disregard INA's related party sales in the profit calculation. *Id.* at ——, 957 F.Supp. at 257. For SKF, Commerce simply applied the statutory minimum of eight percent. *Final Results,* 60 Fed.Reg. at 10,922.

60 Fed.Reg. at 10,922. Commerce's decision to depart from prior practice, as explained in the Final Results, is properly grounded in the statute and, therefore, reasonable. The Court sustains Commerce's exclusion of related party sales from the calculation of constructed value, but remands this case to treat ABB and Astra as unrelated parties in this and all calculations.

### 7. "All Others" Rate

Commerce adopted the "all others" cash deposit rate published in the third administrative review for Swedish ball bearings in the review at issue. *Final Results,* 60 Fed. Reg. at 10,901–02. SKF challenges Commerce's actions claiming that the "all others" rate relied upon is inaccurate. SKF argues that the "all others" rate used in the third administrative review failed to reflect a downward adjustment required by an appeal of the original less than fair value investigation. SKF insists that the error is an obvious one that should have been corrected by Commerce. SKF's Mem. Supp. Mot. J. Agency R. at 66–73.

Commerce responds that SKF lacks standing to challenge the "all others" rate. Commerce maintains that because SKF possesses a company-specific cash deposit rate, the "all others" rate has no applicability to its entries and, therefore, SKF has suffered no injury in fact. Without a redressable injury to SKF, Commerce claims SKF cannot have standing in this Court. Def.'s Partial Opp'n to Mots. J. Agency R. at 31–32.

The Court previously addressed this issue with respect to the "all others" rate applied to AFBs imported by SKF from Italy. In *FAG Italia,* 20 CIT at ——, 948 F.Supp. at 73, the Court found that because Commerce calculated a company-specific cash deposit rate for SKF, the "all others" rate was inapplicable to SKF's entries. As such, SKF had failed to demonstrate injury in fact, a required element of constitutional standing.[3] *Id.* Consistent with its previous holding, the Court finds that SKF lacks constitutional standing to contest the use of the "all others" rate.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) explain the circumstances in which it will apply the reimbursement regulation in an ESP situation; (2) apply a tax-neutral VAT methodology; (3) treat Astra and Asea Brown Boveri as unrelated to SKF; and (4) consider whether a company specific arm's-length test is warranted and, if so, to apply such a test.

### *ORDER*

This case having been duly submitted for a decision, and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to utilize a tax-neutral value-added tax methodology; and it is further

**ORDERED** that Commerce explain the circumstances in which it will apply the reimbursement regulation in an exporter's sales price situation; and it is further

**ORDERED** that Commerce treat Astra and Asea Brown Boveri as unrelated to SKF Sverige AB; and it is further

**ORDERED** that Commerce consider whether a company-specific arm's-length test is warranted and, if so, to apply such a test; and it is further

**ORDERED** that Commerce's determination, to the extent challenged herein, is affirmed in all other respects; and it is further

---

**3.** Pursuant to Article III of the Constitution, federal courts may only adjudicate matters involving an actual case or controversy. *See Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). To demonstrate the existence of an actual case or controversy a plaintiff must demonstrate the following elements of standing: (1) "injury in fact" (*i.e.,* an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent); (2) causation between the injury and the conduct complained of; and (3) likelihood the injury can be redressed. *Cook v. United States Senate,* 20 CIT ——, ——, Slip Op. 96–34, at 4, 1996 WL 61641 (Feb. 9, 1996) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992)).

**ORDERED** that the remand results are due within ninety (90) days of the dates that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date that the responses or comments are due.